Donald Eugene HARDING,
Petitioner–Appellant,

v.

Samuel A. LEWIS,
Respondent–Appellee.

No. 86–2057.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 11, 1987.

Decided Dec. 21, 1987.

Francisco Leon, Tucson, Ariz., for petitioner-appellant.

Jack Roberts, Asst. Atty. Gen., Dept. of Law, Phoenix, Ariz., for respondent-appellee.

Before POOLE and BOOCHEVER, Circuit Judges, and DIMMICK,* District Judge.

BOOCHEVER, Circuit Judge:

Harding appeals the district court's dismissal of his petition for a writ of habeas corpus, 641 F.Supp. 979. He contends that he was not competent to waive his right to counsel at his criminal trial and that his waiver was not made knowingly and intelligently. He also argues that he waived his right to counsel at the recommendation of his attorney, Dan Cooper, and that this advice constitutes per se ineffective assistance of counsel. We affirm.

## FACTS

The evidence that Harding brutally and callously murdered two men was overwhelming. District Judge Marquez detailed that evidence in his order denying Harding a writ of habeas corpus and we set forth that summary in the appendix to this opinion.

Harding was convicted of two counts of first degree murder, two counts of armed robbery, two counts of kidnapping, and one count of theft. He was sentenced to death on each of the murder convictions. For two years while awaiting trial, Harding was represented by a public defender, Dan Cooper. During this period, Cooper filed thirty motions seeking, inter alia, to exclude evidence, to delay the trial, and to develop an insanity defense. These efforts proved futile. Cooper anticipated this and advised Harding that his only chance was to represent himself with the hope of injecting fundamental error in the trial, which would result in reversal of his convictions on appeal. On March 15, 1982,

Harding asked the state court to allow him to represent himself on an unrelated charge of deadly assault by a prisoner. Judge Gin, the state trial judge in both the assault case and the present case, questioned Harding about his education, his experiences with the criminal justice system, and the reasons for his wanting to defend himself. He also warned Harding of the serious penalty he faced if convicted. The court allowed Harding to represent himself on the assault charge and appointed Cooper as advisory counsel at Harding's request.

On March 23, 1982, eight days after Harding made his request to represent himself on the assault charge, Cooper asked Judge Gin to allow him to withdraw from the present case because Harding wanted to act as his own attorney. Judge Gin reviewed Harding's statements about his education and his familiarity with criminal procedure and warned him that he might receive the death penalty if convicted of the murders. The judge, however, did not specifically refer to the difficulties faced by a lay person representing himself. Harding confirmed the judge's review of his background and stated he was absolutely certain he wanted to represent himself. Judge Gin denied the request, however, when Harding refused to sign the waiver of counsel form because it included the appointment of Cooper as advisory counsel.

Cooper apparently told Harding that Judge Gin would relieve Cooper as counsel only if Harding threatened him. Harding told Cooper to consider himself threatened. On April 15, 1982, Harding renewed his request to represent himself. Cooper filed a motion to withdraw for ethical reasons at approximately the same time. The presiding judge of the state court, Judge Druke, held a hearing with Cooper in his chambers and off the record. Judge Druke informed Judge Gin that Harding had told Cooper that he (Harding) intended to commit a crime and Harding had refused to waive any potential conflict of interest that might arise during Cooper's continued representa-

* Honorable Carolyn R. Dimmick, United States District Judge, Western District of Washington, sitting by designation.

tion. Judge Gin discussed with Harding his desire to represent himself and whether Harding would have to accept advisory counsel. The judge then permitted Harding to represent himself but appointed Cooper as advisory counsel, stating that "the problem of threats" would persist no matter who represented Harding or acted as advisory counsel. Cooper continued to pursue some of the pretrial motions he had filed and served as advisory counsel throughout the trial, which started on April 20, 1982.

Harding was convicted on April 27, 1982. The court held a hearing on aggravating and mitigating circumstances for purposes of sentencing on May 26, 1982. The court had ordered a psychiatric evaluation before the hearing, but Harding would not speak to the doctor. The judge twice offered to reappoint counsel, but Harding refused. At the hearing the court again offered to appoint counsel and to permit more time to marshal evidence of mitigating circumstances. Harding declined counsel and presented no mitigating evidence. The court found four aggravating circumstances. Harding was sentenced to death on each of the murder counts. The Arizona Supreme Court affirmed the convictions and the sentences, *State v. Harding*, 137 Ariz. 278, 670 P.2d 383 (1983); the Supreme Court of the United States denied certiorari, 465 U.S. 1013, 104 S.Ct. 1017, 79 L.Ed.2d 246 (1984). Harding filed for post-conviction relief under Arizona's rules of criminal procedure. Ariz.R.Crim.P. 32. The state court held an evidentiary hearing on the issue of whether Harding was denied a fair trial or effective assistance of counsel. The court denied relief and a subsequent petition for reconsideration; the Arizona Supreme Court declined to review the decision. On October 16, 1985, Harding filed an amended petition for a writ of habeas corpus. The district court dismissed the petition.

## STANDARD OF REVIEW

■ We review de novo the district court's decision on a petition for a writ of habeas corpus. *Chatman v. Marquez*, 754

F.2d 1531, 1533–34 (9th Cir.), *cert. denied*, 474 U.S. 841, 106 S.Ct. 124, 88 L.Ed.2d 101 (1985). Factual findings made after a hearing by a state court in a proceeding for post-conviction relief are entitled to a presumption of correctness under 28 U.S.C. § 2254(d).

## ANALYSIS

### Competency to Waive Counsel

■ Due process requires that a state court initiate a hearing on the defendant's competence to waive counsel whenever it has or should have a good faith doubt about the defendant's ability to understand the nature and consequences of the waiver, or to participate intelligently in the proceedings and to make a reasoned choice among the alternatives presented. *See Chavez v. United States*, 656 F.2d 512, 515 (9th Cir.1981); *Sailer v. Gunn*, 548 F.2d 271, 275 (9th Cir.1977); *Sieling v. Eyman*, 478 F.2d 211, 215 (9th Cir.1973). A good faith doubt exists when there is substantial evidence of incompetence. *United States v. Veatch*, 674 F.2d 1217, 1223 (9th Cir. 1981), *cert. denied*, 456 U.S. 946, 102 S.Ct. 2013, 72 L.Ed.2d 469 (1982). Evidence of incompetence includes, but is not limited to, a history of irrational behavior, medical opinion, and the defendant's behavior at trial. *See Drope v. Missouri*, 420 U.S. 162, 180, 95 S.Ct. 896, 908, 43 L.Ed.2d 103 (1975); *Moore v. United States*, 464 F.2d 663, 666 (9th Cir.1972). Whether a good faith doubt should have existed in the trial court's mind is not a factual finding entitled to the presumption of correctness under 28 U.S.C. § 2254(d). *See Sumner v. Mata*, 455 U.S. 591, 597, 102 S.Ct. 1303, 1306, 71 L.Ed.2d 480 (1982) (per curiam).

■ Cooper moved to have Harding examined to determine if he was competent to stand trial and to investigate his mental condition at the time the crimes were committed with the view of developing an insanity defense. At the hearing on this motion, Cooper alleged that Harding suffered from brain disease and epileptic seizures but assured the state court that he was competent to stand trial. On March 5, 1981, Harding moved to withdraw his mo-

tion for examination of his mental condition; the motion was denied. The court appointed two psychiatrists to examine Harding but he was uncooperative with them. The state court found Harding competent to stand trial and Harding does not appeal that finding.

As the district court points out, there was much evidence of Harding's competence to waive counsel that allayed any doubts created by the motion for a mental examination. Harding was responsive and rational at trial. He objected whenever the court or the prosecutor addressed their remarks to advisory counsel rather than to him. He expressed himself boldly and effectively when he chose to do so. During Harding's efforts to dismiss Cooper and represent himself, he wrote a letter to Cooper. The letter acknowledged Cooper's "diligent efforts" and his pursuit of every opportunity to build a defense; it also admitted that there was no good defense and that he would be convicted no matter who defended him. Harding's actions at trial and his written statements to Cooper indicate that Harding understood the consequences of waiving his right to counsel, made a reasoned choice from the limited alternatives available to him, and possessed sufficient intelligence to participate in the proceedings when he chose to do so. The state court did not err when it permitted Harding to represent himself without a hearing on his competence.

### Knowing and Intelligent Waiver

■■■ The trial court must carefully balance the defendant's right to self-representation and its duty to ensure that defendant's waiver of the right to counsel is made with full awareness of the risks. *United States v. Harris*, 683 F.2d 322, 324 (9th Cir.1982). The preferable procedure for determining whether the waiver is made knowingly and intelligently is to discuss with the defendant in open court his understanding of the charges, the possible penalties, and the dangers of self-representation. *United States v. Dujanovic*, 486 F.2d 182, 188 (9th Cir.1973). The failure to engage the defendant in such a colloquy does not necessitate reversal, however, if the record otherwise reveals a knowing and intelligent waiver. *Cooley v. United States*, 501 F.2d 1249, 1252 (9th Cir.1974), *cert. denied*, 419 U.S. 1123, 95 S.Ct. 809, 42 L.Ed.2d 824 (1975). This exception, however, should rarely be invoked. *United States v. Aponte*, 591 F.2d 1247, 1250 (9th Cir.1978). On review, the issue is what the defendant understood about the proceedings, including the possible consequences, and the dangers of acting as his own attorney. *United States v. Kimmel*, 672 F.2d 720, 721–22 (9th Cir.1982). Whether the waiver was made knowingly and intelligently is a mixed question of law and fact which we review de novo. *See Sumner*, 455 U.S. at 597, 102 S.Ct. at 1306.

■■■ The state court inquired about Harding's education and familiarity with criminal procedures when he asked to represent himself on the assault charge.[1]

1. The trial court made the following inquiry when Harding requested to represent himself on the assault charge:

THE COURT: Mr. Harding, is that correct, you want to represent yourself in this case?

MR. HARDING: Yes, I do.

THE COURT: Let me ask you, Mr. Harding, how much education have you had?

MR. HARDING: GED, high school equivalent.

THE COURT: And do you—let's see, have you been tried before on any kind of charge, any kind at all?

MR. HARDING: Yes.

THE COURT: So you think—do you know the ropes legally pretty much as to what the procedures are and that sort of thing?

MR. HARDING: I think so.

THE COURT: Are you unhappy with the Mr. Cooper's representation or what?

MR. HARDING: I am unhappy with the way—that the charge is being processed. This is about eight months old. I never waived speedy trial on it and to my knowledge the prosecution—it has been in suspended animation for eight months now and I don't see any point in that. I would like to enter an oral motion for immediate trial on that.

. . . .

THE COURT: Well, you know Mr. Harding, perhaps you—maybe you don't appreciate the fact that delay often works in your favor.

. . . .

THE COURT: You realize, Mr. Harding, that, you know, you are going to be carrying the ball then hereafter. I am not going to stop the middle of the trial and you say: Hey,

Eight days later, on March 23, 1982, when Cooper first tried to withdraw in the present case, the court warned Harding of the possible penalties and complexities in the action.[2] The court did not, however, explicitly warn him of the difficulties faced by a lay person conducting his own defense. Preferably, the trial court should give such a warning on the record. Without such an explanation by the court of the difficulties and dangers of self-representation, we must look to " 'the particular facts and circumstances surrounding that case, including the background, experience and conduct of the accused.' " *Kimmel*, 672 F.2d at 722 (quoting *Cooley*, 501 F.2d at 1252).

> The district court found that

> [w]ithin three months of his assignment to Harding's case Cooper began discussing with him the possibility of representing himself. They discussed the problems and options available, these included the possibility of an insanity defense, the lack of a factual defense and the chances of receiving the death penalty. Cooper also explained to Harding the concept of fundamental error and the chance of appellate reversal through the right to counsel.

Order of April 30, 1986, at 24 (citations to exhibits omitted). These findings are supported by the record. Harding had the equivalent of a high school education and expressed himself well at trial and in his letter to Cooper. He also had sufficient experience with the criminal justice system to make one of his intelligence aware of the benefits of counsel. We agree with the district court that Harding understood the risks of self-representation.

Harding was adamant in his demands to represent himself. Cooper and Harding apparently concocted the story of threats to force Judge Gin to permit Cooper to withdraw. Unfortunately, the object of their scheme was not original:

> It appears that Romero, by his own deliberate and intentional actions, seeks to insert built-in error in these proceedings, so as to postpone a final inquiry into his failure to comply with the tax laws of this country. Courts are established at public expense to try issues, not to play games.

*United States v. Romero*, 640 F.2d 1014, 1016 (9th Cir.1981).

Although our review of waiver of counsel in a capital case, by its very nature, must be more searching, we cannot countenance deliberate efforts to inject error. As the state court found when it denied Harding's motion for post-conviction relief,

> let's put Cooper on the firing line here now. You know you are it.
>
> MR. HARDING: I understand that. I—
>
> ....
>
> THE COURT: Do you realize, sir, that if the State proves that these were offenses of a dangerous nature and you were previously convicted of a felony that this prison term is mandatory?
>
> MR. HARDING: Twenty-five to life.
>
> THE COURT: You understand that?
>
> MR. HARDING: Yes.
>
> THE COURT: And you are still willing—you are still willing to represent yourself?
>
> MR. HARDING: Absolutely.

Exhibit 24 at 225–41. [*See* EOR at 166–167]

2. When Harding sought to waive counsel in the present case, the following colloquy took place:

> MR. COOPER: Your Honor, this is my application to withdraw on 2597. You granted the motion on the other CR number ten days or so ago. Mr. Harding informed me after that hearing ten days ago that on the murder case he desire to represent himself as well and does not want the services of an attorney, and particularly of me or of our office.
>
> THE COURT: Is that correct, Mr. Harding?
>
> MR. HARDING: Yes.
>
> THE COURT: Mr. Harding, you know you are charged in 2597 with first degree murder. That could result in the death sentence. I just remind you of this because it is a terribly serious terribly complex case. Are you quite certain you want to represent yourself in a matter like that?
>
> MR. HARDING: Absolutely.
>
> THE COURT: Let's see, I did ask you some questions last time about your education. I believe you told me—.
>
> MR. HARDING: High school equivalent.
>
> THE COURT: High school equivalent. And you indicated you thought you had a pretty good familiarity with criminal procedure and rules. Do you want Mr. Cooper to be your advisor counsel in this thing?
>
> MR. HARDING: No, I wouldn't care to have an advisor.
>
> ....

Exhibit 24 at 245–54. [*See* EOR at 167–168]

his waiver was an act of desperation done by a man with the intelligence to know he was in a situation requiring desperate measures. He knew he could be sentenced to death if convicted. He knew he would in all likelihood be convicted. We conclude that Harding made his waiver knowingly and intelligently.

*Per Se Ineffective Assistance of Counsel*

▮ Most claims of ineffective assistance of counsel must be analyzed according to the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To succeed, the defendant must show that counsel's performance was deficient and that without counsel's errors there is a reasonable probability that the result would have been different. *Id.* at 687, 694, 104 S.Ct. at 2064, 2068. Harding, realizing that he cannot demonstrate that his waiver prejudiced the result, argues that Cooper's recommendation to waive counsel should be presumed prejudicial. *See United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984).

In *Cronic*, the Supreme Court reiterated that, in most cases, a defendant must demonstrate that the alleged error of his attorney had "some effect ... on the reliability of the trial process." *Id.* at 658, 104 S.Ct. at 2046. It created an exception, however, for those "circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *Id.* (footnote omitted). Such circumstances are the complete absence or denial of counsel at a critical stage of trial, and situations where the likelihood that counsel could have been an effective adversary was so remote that the trial was inherently unfair. *Id.* at 659–61, 104 S.Ct. at 2047–48. "Apart from circumstances of that magnitude, however, there is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the

reliability of the finding of guilt." *Id.* at 659 n. 26, 104 S.Ct. at 2047 n. 26.

We conclude that Cooper's advice of self-representation to Harding should not be presumed prejudicial. In this case, it is not unduly burdensome for us to assess the effect of that advice on the outcome of Harding's trial. If a legal or factual defense exists such advice is clearly prejudicial. Harding does not assert that any such defense was available, and we find none after our own examination of the evidence. If the defendant did not understand counsel's reasons for suggesting this strategy and the risks involved in pursuing it, he is entitled to the relief of the writ. *Cf. Martin v. Rose*, 744 F.2d 1245, 1249–51 (6th Cir.1984) (counsel, mistakenly believing that participating in the trial would waive certain pretrial motions, did not explain to his client his failure to participate or the consequences of it; defendant entitled to habeas corpus relief under the *Strickland* test because waiver of counsel was not made knowingly or intelligently). We have already determined that Harding was a knowing and willing participant in this scheme. He knew "what he [was] doing and his choice [was] made with eyes open." *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279, 63 S.Ct. 236, 241, 87 L.Ed. 268 (1942); *Dujanovic*, 486 F.2d at 187.

There is another reason for refusing to presume prejudice in this case. The presumption would create a foolproof defense. *See Martin*, 744 F.2d at 1251–52. If Harding had been successful in creating fundamental error by representing himself, he would have been entitled to a new trial. If prejudice is presumed because Cooper advised him to do so,[3] habeas corpus relief would entitle him to a new trial or release from custody even though he otherwise failed in his attempt to create an unfair trial. We cannot allow this tempting gambit for counsel and client.

---

**3.** This opinion does not furnish an appropriate occasion to comment on the propriety of Cooper's conduct. We take judicial notice, however, that at the time Cooper advised Harding, Arizona Disciplinary Rules 1–102(A)(4) and (5) provided that an attorney shall not "[e]ngage in

conduct involving dishonesty, fraud, deceit, or misrepresentation" or "[e]ngage in conduct that is prejudicial to the administration of justice." Rule 7–102(A)(5) further provided that a lawyer shall not "knowingly make a false statement of law or fact."

## CONCLUSION

We conclude that Harding was competent to waive his right to counsel, that he did so knowingly and intelligently, and that he was not prejudiced by Cooper's advising him to do so. The denial of the writ of habeas corpus is therefore

AFFIRMED.

## APPENDIX

On January 26, 1980, the Tucson Police Department was called to investigate suspicious circumstances at the La Quinta Motel in Tucson, Arizona. The Officers involved discovered two bodies, one located next to the bed and the other in the bathroom. The bodies were identified as Martin L. Concannon and Robert A. Wise. The jury was shown approximately 150 pictures depicting the room where the crime occurred and the autopsies performed on the victims. The pictures demonstrated that the victims were bound repeatedly with various types of ligatures. The body of Martin L. Concannon was found on the floor of the bathroom covered with a bedspread. His body had been repeatedly bound, two men's socks stuffed into his mouth and a pillow placed under his head. Robert Wise's head was tethered to the bed and he was hogtied with his feet bound together and tied with a sheet to his elbows. A belt had been wrapped around his wrists which constricted his hands. Blood splattered on the walls indicated that Wise was beaten repeatedly. Pieces of teeth were found underneath his head. Small chips of synthetic wood were found under the body which were identified as pieces from the base of the hotel room lamp. Chemical analysis showed human blood on the base of this lamp. The harp of the lamp was found near Wise's body. The lamp itself had been plugged back into the wall.

Identifiable prints were taken from the do-not-disturb sign found outside the door, a small glass on the table near the bed, cellophane wrapping from a package of Winston cigarettes and off the top part of the lampshade. All four of these fingerprints were identified as matching those of Donald Harding. Fingerprints were also removed from the telephone receiver, a light bulb and an ashtray. These prints were also identified as matching those of Donald Harding.

The pathologist testified that Robert Wise was shot in the chest from front to back and in the left temple. The wounds revealed that he was shot with the muzzle of the gun only a few inches from the skin. He sustained a multiple fracture to the jaw and his teeth had been broken by repeated impacts with a blunt object. A tether had been placed around Wise's neck with enough force to create a U–shaped abrasion, which penetrated the skin, causing the blood vessels to rupture. The victims wrists had been tightly bound. Wise's death was caused by the bullet wound to the chest which perforated the spinal cord. The time of death was estimated by the pathologist at between 1 p.m. and 7 p.m. on January 25, 1980.

The autopsy performed on Martin Concannon showed that his death was also caused by a shot to the chest which perforated the spinal cord. He had also been shot in the temple. The autopsy revealed that the two socks which had been pushed to the back of his throat had covered all breathing passages. Hemorrhaging in the scalp tissue, caused by lack of oxygen, indicated that Concannon had not died immediately.

Jeri Wise testified that her husband was the district manager for KAR Products. She testified that he left the 24th of January to see Marty Concannon, one of his salesmen, and to make a call in Ft. Huachuca. Mrs. Wise expected him to return the next day, January 25, around 6:30 p.m. At approximately 8:40 on that night a man came to the Wise's home and asked if Bob was there. Mrs. Wise testified that the man was holding one of her husband's business cards and acting very nervous. She stated that he was wearing a rust colored jacket and a burgundy shirt. The man left the Wise's home when she told him she expected her husband home soon as he was already overdue. Mrs. Wise positively identified Donald Harding as the man at her door that night.

January 26, 1980, a Northern Arizona University police guard was assigned to a parking lot near the athletic dome on the NAU campus to ensure that only members of the booster club parked in the lot. He observed a man driving an Oldsmobile, with Ohio plates, pull into the lot. The guard told the driver that he would not be allowed to park in the lot. The driver asked if there was a place he could park and the guard suggested a lot north of the dome. The guard identified the driver of the car as Donald Harding. The Oldsmobile he was driving belonged to Martin Concannon.

The guard testified that Harding appeared a little strange because he spoke with a Southern accent but was driving a car with Ohio plates. He testified Harding was also wearing two jackets and had numerous articles in the back seat. The guard ran a warrants check on the car and was told that it had been stolen from Tucson. He called for back up units and they arrested Harding. A body search revealed a .25 automatic in Harding's jacket pocket. A ballistics check run on the gun showed that it was the same weapon used to kill Concannon and Wise in Tucson. Two security badges, a wallet and an identification card issued to Ronald Svetgoff were also found on Harding. Harding told the NAU police that he was Svetgoff but looked different because he had lost some weight and changed his hair.

Robert Svetgoff testified that he was robbed in a motel in Waco, Texas on December 18, 1979 by a man he identified as Donald Harding. He said that Harding approached him, showed him a security badge, identified himself as a security officer and demanded that Svetgoff produce identification. Svetgoff identified one of the badges found on Harding as the one used during this robbery. When Svetgoff opened the door to his hotel room, Harding pulled a gun, forced Svetgoff onto the floor and tied him up with a tie, a torn dress shirt and his jumprope. Harding put a sock in Svetgoff's mouth, wrapped a t-shirt around that and then tied a belt around his mouth. Harding then rolled Svetgoff in a bedspread, dragged him into the bathroom and placed a pillow under his head. Harding stole all of Svetgoff's clothes and left in his car.

The Tucson police executed a search warrant on the car that Harding was driving when he was arrested. In it were found; 1) a tan attache case (which Mrs. Wise identified at trial as her husband's), 2) loose credit cards in the name of Robert Wise and 3) a box of pens and a memo pad with KAR logo.

The Tucson police obtained clothing from the Coconino County Jail which included a burgundy colored long-sleeved shirt, a pair of black shoes and two jackets. Jeri Wise identified the burgundy shirt as the one Harding was wearing when he came to her house. Chemical tests performed on this shirt showed the presence of human blood. Inside one of the jackets was Robert Wise's drivers license and page C–D torn out of an address book with the names of Pam and Martin Concanon circled.

Two statements made by Harding were introduced into evidence at the trial. The first was made while Harding was being transported from Flagstaff to Tucson. A Tucson police detective testified that it was a cold day and Harding was wearing only a short-sleeved shirt. The detective opened his suitcoat to protect him from the wind while they waited for the airplane. The detective testified that Harding looked at him and said "you don't need to do that, I deserve whatever I get."

Harding made a second statement in Tucson. The same detective testified that Harding asked if he could get some of his clothes returned and that the detective told him that the police had to keep the clothes in order to look for evidence. Harding told the detective that he might find something on the burgundy shirt and shoes but the rest of the clothing had not been worn. Order of April 30, 1986, at 2–7 (citations to exhibits omitted).