**STATE of Utah, Plaintiff and Appellee,**

v.

**Hans Jurgen DROBEL, Defendant and Appellant.**

No. 890472–CA.

Court of Appeals of Utah.

July 10, 1991.

725

Kristine Kay Smith and Jerome H. Mooney, Mooney & Associates, Salt Lake City, for defendant and appellant.

R. Paul Van Dam, Atty. Gen., and David B. Thompson, Asst. Atty. Gen. (argued), Salt Lake City, for plaintiff and appellee.

Before BENCH, GREENWOOD and ORME, JJ.

## OPINION

GREENWOOD, Judge:

Appellant Hans Jurgen Drobel appeals his conviction and sentence for three counts of aggravated robbery, Utah Code Ann. § 76–6–302 (1978), a first degree felony. We affirm.

## BACKGROUND

### The Crimes

In the afternoon and early evening of August 11, 1986, three small stores in Salt Lake City were robbed in succession. The store cashiers described the perpetrator and method in each robbery as follows:

The robber was a middle aged gentleman, well dressed in a dark suit and tie, with a noticeable German accent. He browsed each store for a short while, and purchased a refreshment at two of them. Then, when no other customers were present, the robber approached the cashier, revealing a holstered pistol under his suit jacket, and announced that he was committing a robbery. He then took currency from the cash register.

The female cashiers at the first and third stores were told to wait some period of time before reporting the robberies, and to then give the police a false description of the robber. He told the women that if they did not comply with these instructions, he would return and shoot them, not to kill, but to cripple. The male cashier at the second store was admonished not to call the police or the robber would return to shoot him.

During the third robbery, one of the cashiers was able to summon security guards from the mall where the store was located. Police were also contacted. Leaving the mall on foot, the robber was followed by two security guards. It appears that the security guards briefly lost sight of the robber as he went around a corner. Rounding the corner themselves, the guards encountered the police, who had apprehended Drobel.

A plainclothes police detective responding to the robbery call had stopped Drobel

in an alleyway roughly two blocks from the robbery scene. Drobel, a German, clad in a dark suit and tie, was jogging down the alley when apprehended. Other police officers quickly arrived, whereupon the detective removed a loaded pistol from a holster in Drobel's waistband.

In custody, Drobel was asked to empty his pockets. Taking cash from one pocket, Drobel said the money was "from the store." He claimed that cash from another pocket belonged to him. A beverage bottle handled by the robber at one of the stores was found to have Drobel's fingerprint on it. Cashiers at two of the stores were shown photo spreads from which they identified Drobel as the robber.

Drobel was charged with aggravated robbery and arraigned before Judge Sawaya of the third district court. He obtained counsel from the Salt Lake Legal Defenders' Association. Concerns about Drobel's mental condition soon arose. These concerns dealt with both Drobel's mental state at the time he allegedly committed the robberies and his competence to stand trial. In September 1986, defense counsel filed a notice of intent to rely on a defense of diminished capacity, and psychiatric evaluations were ordered by Judge Sawaya. A two and one-half year period of psychiatric evaluations and court hearings ensued, in an effort to determine whether Drobel was competent to stand trial.[1]

*Competency Determination*

Two psychiatrists, Breck Lebegue, M.D., and Peter Heinbecker, M.D., were initially appointed to examine Drobel, pursuant to Utah Code Ann. § 77–15–5(2)(b) (1990). At a December 1986 hearing, Judge Sawaya was informed that the examiners did not then agree on the question of Drobel's competence to stand trial. Dr. Heinbecker had determined that he was competent. Dr. Lebegue had found Drobel not competent to proceed and recommended further evaluation. Accordingly, Judge Sawaya ordered a thirty-day evaluation at the Utah State Hospital, under Utah Code Ann. § 77–15–5(2)(a) (1990).

Following the thirty-day evaluation, another hearing was held before Judge Sawaya. At the parties' stipulation, the only evidence taken at that hearing was a letter from state hospital evaluators Heinbecker, Van Austin, M.D., and Robert Howell, Ph.D. The three experts opined that

> Mr. Drobel has a mental illness of the chronic schizoaffective schizophrenic type associated with paranoid delusional features. His thought processes, affect, and ability to perceive and interpret reality are each inappropriate.
>
> We find that at this time he lacks the ability to comprehend the nature of the charges against him and the punishment specified for the offense charged and lacks the ability to meaningfully assist his counsel in his defense.[2]

Based on this evidence, Judge Sawaya ordered that Drobel remain at the state hospital and receive treatment for his mental condition until competent to stand trial. *See* Utah Code Ann. § 77–15–6(1) (Supp. 1991).

Over a year later, in February 1988, Doctors Heinbecker, Austin, and Howell again wrote to Judge Sawaya. They informed the judge that Drobel remained incompetent to stand trial, and that his men-

---

1. No evaluation regarding the diminished capacity defense is on record. Because this appeal concerns only the questions of Drobel's competence to stand trial and to represent himself, the lack of a diminished capacity evaluation is not of immediate concern here.

2. This evaluation fit Utah's statutory definition of "incompetent to proceed":
 [A] person is incompetent to proceed if he is suffering from a mental disease or defect resulting either:
 (1) In his inability to comprehend the nature of the proceedings against him or the punishment specified for the offense charged; or
 (2) In his inability to assist his counsel in his defense. Utah Code Ann. § 77–15–2 (1990). This definition codifies the long accepted principle that "a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to trial." *Drope v. Missouri*, 420 U.S. 162, 171, 95 S.Ct. 896, 903, 43 L.Ed.2d 103 (1975).

tal illness remained unimproved despite intensive counseling and medication treatment. However, they also revealed "some degree of doubt as to his diagnosis," and raised the possibility that Drobel might be "malingering, that is, feigning the symptoms of mental illness as a manipulation." Despite this doubt, the doctors recommended dismissal of the criminal charges without prejudice so that they could have Drobel civilly committed for treatment of his mental illness.[3]

Judge Sawaya dismissed the charges without prejudice, and a civil commitment hearing was held in April 1988, before Judge Harding of the fourth district court.[4] The effort to civilly commit Drobel failed, apparently because the requisite element of dangerousness, Utah Code Ann. § 62A–12–234(10)(b) (Supp.1991), could not be proven.[5] Informing the prosecutors in Salt Lake City of this development, Dr. Heinbecker reported that Drobel's conduct at the civil hearing had been "impressive," indicating that he was probably competent to stand trial on the criminal charges.

The criminal charges against Drobel were promptly refiled, and he remained in custody. Another hearing before Judge Sawaya followed, in August 1988. Because the state hospital doctors had not definitively informed Judge Sawaya that Drobel was competent to stand trial, another thirty-day evaluation was ordered. Following this evaluation, Doctors Austin and Howell reported that they found Drobel competent to stand trial. Dr. Howell reiterated this opinion during an October 1988 hearing before Judge Sawaya. Elaborating, Dr. Howell opined that although Drobel suffered from "a delusional disorder of the expansive grandiose type," this mental illness did not impair his understanding of the charges against him, the possible punishments, or his ability to assist counsel in his defense.

Ongoing questions about Drobel's competence to proceed prompted Judge Sawaya to order yet another evaluation from Dr. Lebegue.[6] A final competency hearing followed, in November 1988. At that hearing, Dr. Lebegue's opinion that Drobel was competent to stand trial, subject to certain reservations, was presented through representations of counsel for Drobel and the State. A letter from Dr. Lebegue to Judge Sawaya, entered into the record at the parties' agreement, explained Lebegue's opinion and recommendations.

In his letter, Dr. Lebegue, like Dr. Howell, opined that Drobel suffered from "mental illness, probably a delusional disorder of the grandiose type." This disorder was causing "significant impairment in his ability to think rationally." On the other hand, Dr. Lebegue stated that Drobel had "no

---

**3.** The doctors' request was based on *Jackson v. Indiana,* 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972). *Jackson* prohibits the involuntary confinement of a criminal defendant who is incompetent to stand trial for any more time than is necessary to determine whether there is a substantial probability of competency being restored in the foreseeable future. If no such probability exists, the defendant must either be civilly committed or released. 406 U.S. at 738, 92 S.Ct. at 1856.

It was not necessary, however, to dismiss the criminal charges against Drobel while his civil commitment was being pursued. The criminal proceedings only needed to be stayed. *Cook v. Steed,* 758 P.2d 906, 908 (Utah 1988).

**4.** The fourth district court is in Provo, where the state hospital is located. Utah Code Ann. § 62A–12–234(1) (Supp.1991) allows civil commitment hearings to be held where "the proposed patient resides or is found."

**5.** At the time of the civil commitment effort, the statute governing civil commitments was Utah Code Ann. § 64–7–36 (1986). The current statute, section 62A–12–234, contains no apparent substantive changes relevant to this appeal.

The record of the failed commitment effort is not before us. The failure to commit Drobel was relayed to prosecutors by Dr. Heinbecker, who wrote that Judge Harding "reportedly would not allow evidence of Hans Drobel's criminal behavior admitted into the hearing." The elements to justify civil commitment must be shown by clear and convincing evidence. Utah Code Ann. § 62A–12–234(10). Additionally, a civil commitment hearing is governed by the Utah Rules of Evidence. Utah Code Ann. § 62A–12–234(9)(e).

**6.** The record does not show at exactly whose request this last evaluation was ordered. At the end of the October 1988 hearing, however, Drobel's counsel had requested a continuance to locate evidence rebutting Howell's opinion that Drobel was competent to proceed.

mental process that interferes with his cognitive ability (his ability to understand, remember, or interpret facts)." Specifically addressing the competence issues of ability to understand the charges and punishment, and to assist counsel in his defense, Dr. Lebegue indicated that Drobel was "marginally competent to stand trial."

Dr. Lebegue cautioned that Drobel's competence could shift to incompetence during trial. Dr. Lebegue's major concern was that Drobel's delusional and irrational thinking might cause him to adopt inappropriate defense strategies.[7] Such strategies could include "firing Defense Counsel, refusing to accept Defense Counsel recommendations, insistence on testifying over Defense Counsel objections, delusional religious thinking, grandiose denunciation of ... trial process," and other behaviors. Dr. Lebegue advised the court and counsel to be alert for these behaviors, and recommended that Drobel's trial competence be reevaluated if they arose.

Based on the updated evaluations of Doctors Austin, Howell, and Lebegue, Judge Sawaya found Drobel competent to stand trial. In January 1989, Drobel was rearraigned in the third district court, this time before Judge Young. Drobel pleaded not guilty to the aggravated robbery charges. He then insisted on the right to represent himself at trial.

### Self–Representation Request

Both the State and defense counsel objected to Drobel's request to represent himself. Defense counsel, summarizing the repeated competence evaluations, pointed out that Drobel's request had been identified by Dr. Lebegue as a possible sign that Drobel was not competent to stand trial,

much less defend himself.[8] Counsel informed the court that Drobel wished to reject the diminished capacity defense which, in counsel's view, was Drobel's strongest defense. The State argued that although Drobel was competent to stand trial, he was not competent to conduct his own defense.

Judge Young then questioned Drobel. Drobel stated that he would keep his appointed counsel on a standby basis. Asked if he felt he could conduct his own witness examinations and cross examinations, Drobel stated he had reviewed the process with counsel: "[A]s Mr. Garcia promised me to do, he would give me further counsel about this. And I know that I have to learn quite a bit about this[,] but there is no problem to learn a simple procedure." Apprised of the possible sentences for the charged crimes, Drobel claimed, "I'm totally aware of the risk but I think the risk is lower if I defend myself than leaving my fate into the hand of somebody else." Drobel then recited his background as a "business consultant" in Germany, possessing twenty-four years of formal education, "mainly in business, and also I have two teacher degrees"; he also claimed to have been a teacher in Germany and to have "done quite a lot of business here in the United States."

As justification for his request to represent himself, Drobel cited his observation that lawyers "often suffer under the lack of imagination," a handicap he, a businessman, did not suffer. As an example, he claimed to have sold Saab automobiles to Arabs. "If you can sell something to the Arabs[,] you can do something."

Unimpressed by Drobel's imagination, and concerned with the magnitude of the

---

**7.** Drobel had refused to share any specifics of the trial strategies he claimed to have with any of the examiners. Apparently based on hospital staff observations that Drobel had been "preaching" to those in his state hospital unit, the evaluators surmised that his trial defense would involve his religious beliefs.

**8.** Drobel took exception to counsel's concerns about his competence:

I'm wondering greatly about what my attorney said about believing that I am mentally

ill. Actually, there were in the hospital only two or three doctors among all the other hospital personnel who believed for a while that I was mentally ill. The fact is it is very easy to be considered mentally ill if you have an above average intelligence or an above average education, which I have.... And I would say, Albert Einstein or anybody like that would be considered mentally ill too if nobody would know who he was.

charges and with questions regarding Drobel's mental health, Judge Young denied Drobel's request to represent himself. One week later, however, he convened another hearing to reconsider the matter, apparently sua sponte.

At the second hearing on Drobel's request, Judge Young carefully reviewed the matter with Drobel. Drobel reiterated his wish to represent himself, acknowledging that self-representation was against the court's recommendation. The possibility of consecutive, five year to life sentences on the three robbery charges was explained, and Drobel expressed his understanding. Judge Young queried Drobel about the diminished capacity defense recommended by counsel, and Drobel confirmed his rejection of that defense.

Drobel was also asked about his desire to raise a "creative defense." Here, Drobel specifically corrected Judge Young's recollection of the prior hearing, reminding him that he had used the term "imagination," rather than "creative defense."

On further questioning, Drobel claimed that he understood how trial would proceed, and that he understood his right to confront the State's witnesses and to call his own witnesses, by compulsory process if needed. He stated he was prepared to deal with relevance, hearsay, and other objections to trial evidence. Drobel was admonished that any evidence he presented would be subject to the rules of evidence, particularly with respect to relevancy, and he stated he understood this. At the State's request, the expectation that evidentiary and procedural rules be followed was repeated to Drobel, who again said he understood.

In response to Judge Young's observation that Drobel spoke "fluent English," Drobel asked for the appointment of "a couple of translators." Asked to elaborate on his training in English, Drobel said he had learned the language in school, and applied it in business dealings in Europe, as well as during his seven years in the United States. He then indicated that his particular concern was with legal terminology, and made reference to needing standby counsel to help him with this. No interpreter was provided for Drobel.

Finally, Drobel denied that he had been under any external pressure to represent himself, and stated that his request was voluntary. Judge Young then granted Drobel's request to represent himself, aided by standby counsel. The trial date was postponed one week to give Drobel more time to consult with standby counsel in preparation for trial.

### Hans Drobel, Pro Se

Representing himself, Drobel filed a thirty-five page, handwritten pretrial "motion to dismiss" the case against him. Grounds for the motion were set forth in seven "chapters" of the document. Chiefly, Drobel's motion emphasized the desirability of sparing the wasted money, embarrassment, and public shame inherent in prosecuting a case which the State could not win. Drobel assured the court "that I will not only shatter the prosecutions [sic] evidence and destroy the credibility of the prosecution[']s witnesses, but also present such facts to the jury (in the form of materials and witnesses) that the jury members can not speak different than: NOT GUILTY!'"

Drobel's confidence in a favorable trial outcome was reflected in the statement, repeated several times in his motion, "The Lord is my lawyer—I can not fail." He also listed an array of past "achievements," as a supermarket manager, cut flower entrepreneur, amateur detective, and award-winning businessman and teacher. He claimed to have received several awards from President Reagan, including "the right for my eldest son to choose any career within the Government (incl. all Services) he wants."

"Chapter VI" of Drobel's motion addressed the potentially viable defense of mistaken identity. Claiming that the witnesses had given inconsistent identifications of the robber, he claimed, "they did not see me, but someone *like* me!" (Emphasis in original.) To illustrate this point,

Drobel's motion included a lengthy "fable" about a bear accused of stealing chickens.[9]

In "Chapter VII," Drobel complained that he had been denied access to an adequate law library and books to use in preparing his defense. He did state, however, that he had received photocopies of legal materials from his standby counsel. He cited Rule 25(b)(1), Utah Rules of Criminal Procedure, delay in going to trial, as one ground to dismiss the charges.

In pretrial conference, Judge Young denied Drobel's motion to dismiss and admonished him to keep his arguments and evidence within the bounds of relevancy. Drobel stated that he understood this warning.

Drobel's trial took place in February 1989. Although the trial spanned two days, the total time spent was no more than one day. This contrasted with the prosecutor's original estimate that two or three days would be needed, and also with Drobel's assertion that he would need ten days, because he planned to call over twenty defense witnesses.

The brevity of the trial is explained by Drobel's complete failure to raise any defense. In contrast to the "bone crushing fighting" threatened in his pretrial motion, Drobel politely declined Judge Young's invitations, extended at the appropriate times, to present an opening statement, cross examine the State's witnesses, produce defense witnesses, and make a closing argument. Nor did Drobel request any intervention or assistance from his standby counsel. The State's unopposed evidence, as related in our account of the robberies,

convinced the jury to convict Drobel as charged.

Drobel was sentenced to five years to life imprisonment on each of the three charges, to be served consecutively. Subsequently, Drobel obtained professional counsel, and this appeal followed.

## ISSUES

On appeal, Drobel argues that (1) the trial court erred in allowing him to represent himself; (2) he was not given adequate resources to prepare for trial; and (3) in sentencing, he should have been given credit for his lengthy pretrial incarceration in jail and at the state hospital.

## SELF–REPRESENTATION

 The right to defend oneself in a criminal prosecution has been established under the sixth amendment to the federal constitution. *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). This right is also specifically provided in Article I, section 12 of the Utah Constitution.[10] *State v. Hamilton,* 732 P.2d 505, 507 (Utah 1986) (per curiam); *State v. Penderville,* 2 Utah 2d 281, 272 P.2d 195, 199 (1954). *See also* Utah R.Crim.P. 8. Because the exercise of this right necessarily constitutes a waiver of the important right to professional counsel, trial courts have an affirmative duty to determine that a defendant who chooses self-representation does so knowingly and intelligently. *Faretta,* 422 U.S. at 835, 95 S.Ct. at 2541; *State v. Lafferty,* 749 P.2d 1239, 1248 (Utah 1988), *aff'd,* 776 P.2d 631 (Utah 1989); *State v. Frampton,* 737 P.2d 183, 187 (Utah 1987).[11] This determination

---

**9.** Drobel's bear, armed with formidable claws, and with apparent chicken blood and feathers in his fur, was apprehended by dogs. Sheep had witnessed the bear in the chicken pen. A "smart Owl–Judge" found the sheep to be unreliable witnesses, the dogs poor investigators, and the owner of the chickens negligent in maintaining his fence, and dismissed the charges. The bear had simply been "at the wrong place at the wrong time."

**10.** "In criminal prosecutions the accused shall have the right to appear and defend in person and by counsel...." Utah Const. art. I, § 12.

**11.** The *Faretta* opinion, reciting the "knowing and intelligent" standard for waiver of constitutional rights, speaks in the same paragraph of the need to "*competently* and intelligently choose self-representation." 422 U.S. at 835, 95 S.Ct. at 2541 (emphasis added). We prefer the term "knowingly" to "competently," because the latter term may imply a separate psychiatric assessment of competence, beyond that used to determine competence to stand trial, that, as set forth in the body of this opinion, we do not believe is necessary to invoke the right of self-representation.

turns "upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938).

Drobel argues that the trial court erred in finding that his choice to represent himself was knowingly and intelligently made.[12] This argument contains two components. First, Drobel argues that the trial court's inquiry into the particular circumstances presented by his questionable mental health was inadequate. Next, Drobel argues that had that inquiry been adequate, it would have revealed that, although he was mentally competent to stand trial, he was not competent to make the choice to represent himself.[13] We address these contentions in turn.

### Trial Court Inquiry

In *Frampton,* our supreme court identified a penetrating, on-the-record, colloquy between defendant and the trial court as the preferred method of ascertaining whether defendant understands the risks of self-representation, and, therefore, chooses that option knowingly and intelligently. 737 P.2d at 187. *Accord, Harding v. Lewis,* 834 F.2d 853, 857 (9th Cir.1987). *See also Von Moltke v. Gillies,* 332 U.S. 708, 723–24, 68 S.Ct. 316, 323, 92 L.Ed. 309 (1948) (guilty plea coupled with waiver of counsel requires "penetrating and comprehensive examination of all the circumstances under which such a plea is tendered").

As a guide for a colloquy with a prospective pro se defendant, the *Frampton* court noted a sixteen-point inquiry recommended for federal trial courts. The federally recommended inquiry addresses: whether defendant has studied law; defendant's experience at self-representation; the charges and possible penalties faced; familiarity with, and the expectation of adherence to, procedural and evidentiary rules; a warning that the trial court will not direct or advise the defense; a recommendation against self-representation; and whether the choice of self-representation is voluntary. Finally, appointment of standby counsel should be considered. 737 P.2d at 187–88 n. 12 (quoting Bench Book for United States District Court Judges, vol. 1 §§ 1.02–2 to –5 (Federal Judicial Center, 3d ed. 1986)).[14]

Here, before ultimately granting the request to proceed pro se, the trial court conducted two careful colloquys with Drobel. As recounted in our recitations of those proceedings, the record clearly shows that the colloquy recommended in *Frampton* was followed in essence if not verbatim.[15]

As for the term "intelligent," the word as used in this context is taken to mean only that the defendant has been provided with adequate information on which to make his or her self-representation choice. Because such a choice is seldom, if ever, a wise one, "intelligent" does not carry that meaning here.

The choice to represent oneself must also be voluntary. *Frampton,* 737 P.2d at 187. As applied here, we interpret "voluntary" to mean free from official coercion, even if not free from the influence of a mental disorder. As for the latter influence, it is to be considered, as set forth in the main text, as part of the question of whether the choice is made knowingly and intelligently.

12. Although the trial court did not formally make this finding, the finding is implicit in its inquiry into and grant of Drobel's request to represent himself. *See also State v. Ramirez,* —— P.2d ——, —— n. 6, 159 Utah Adv.Rep. 7, 16 n. 6 (Utah 1991) (absence of formally stated findings does not necessarily require remand).

13. At the first hearing into Drobel's request to proceed pro se, his counsel raised the possibility that the request itself was evidence that Drobel was no longer competent to stand trial. No repeat hearing into this issue was requested, however, and on appeal no argument is made that Drobel was incompetent to stand trial. We therefore proceed on the assumption that Drobel was competent to stand trial.

14. The supreme court did not, nor do we, mandate that all of these points be covered in the court's colloquy with the defendant, but suggest that they provide a useful framework.

15. The court did not make a specific inquiry into Drobel's legal training and experience in defending himself. Drobel himself, however, addressed this point: "My handicap might be that I'm not so good in speaking English as Americans are, also I might have a handicap in the point that I have to learn the procedure of the court, but everything else I can handle just fine. I've proven that before."

■ However, the *Frampton* colloquy alone cannot form the basis for granting a self-representation request when other information available to the trial court suggests that the request may not be knowingly and intelligently made. "In determining whether a defendant knowingly and intelligently waived his right to counsel, we must consider the total circumstances of the individual case including background, experience and the conduct of the accused person." *United States v. Padilla*, 819 F.2d 952, 958 (10th Cir.1987) (quotations and citations omitted). *See also Zerbst*, 304 U.S. at 464, 58 S.Ct. at 1023; *Frampton*, 737 P.2d at 188. Here, Drobel's questionable mental health was among the circumstances to be included in the consideration of his request to represent himself.

■ Regarding Drobel's mental health, the psychiatric evaluations were received and considered by Judge Sawaya to determine Drobel's competence to stand trial, but the case was then transferred to Judge Young. Drobel complains that the record does not reveal whether Judge Young ever reviewed the psychiatric reports in considering the self-representation request. However, while Judge Young never specifically indicated that he had personally reviewed all the reports, his colloquy with Drobel at the second hearing of the self-representation request indicates that he did so. In that colloquy, the judge reviewed the history of Drobel's competence evaluations in detail, consistent with having a personal familiarity with them.

In addition, the record clearly shows that Drobel's mental condition was taken into account in considering the self-representation request. At the first hearing on the

request, Drobel's then-counsel fully reviewed the various psychiatric assessments for Judge Young. Specifically referring to the most recent competency evaluation, counsel argued that Drobel was acting under a religious delusion in asking to represent himself. The prosecutor also expressed concern about Drobel's mental condition. Finally, Judge Young addressed these concerns in interviewing Drobel about his request, and in initially denying the request.[16]

The record therefore reflects that the trial court correctly and thoroughly interviewed Drobel regarding his desire to represent himself, and that other critical facts and circumstances related to his request—here, his mental condition—were taken into account. Therefore we conclude that, as a matter of law, the trial court's inquiry into Drobel's request was sufficient. We must next consider whether, in light of all the information before the trial court, it was proper to grant Drobel's request.

*Competence to Assert Right of Self–Representation*

Drobel asserts that even though he was competent to stand trial, his mental condition rendered him incompetent to assert his right of self-representation. He argues that the "standard of competence for making the decision to represent oneself is *vaguely higher* than the standard for competence to stand trial." *United States ex rel. Konigsberg v. Vincent*, 526 F.2d 131, 133 (2d Cir.1975) (emphasis added), *cert. denied*, 426 U.S. 937, 96 S.Ct. 2652, 49 L.Ed.2d 388 (1976) (citing *Westbrook v. Arizona*, 384 U.S. 150, 86 S.Ct. 1320, 16 L.Ed.2d 429 (1966)).[17]

The *Frampton* inquiry also recommends that the court make an oral finding to the effect that defendant has knowingly and voluntarily waived the right to counsel. 737 P.2d at 188 n. 12. As to the court's omission of this step here, see note 13.

**16.** The request was initially denied on the basis of a finding that it was not in Drobel's "best interests" to represent himself. As pointed out in *Faretta*, 422 U.S. at 834, 95 S.Ct. at 2540, self-representation will rarely, in terms of likely trial outcome, be in a defendant's best interest. The correct test is whether the request is know-

ing and intelligent. Judge Young thus properly reconsidered Drobel's request, for it probably would have been reversible error to deny it solely on the basis of his best interests.

**17.** In *Westbrook*, a one-page, per curiam decision, the United States Supreme Court remanded a case involving a pro se criminal defendant who had received a hearing on his competence to stand trial, but received no hearing on his competence to waive his right to counsel and to represent himself. We believe that the issue of "competence" to waive counsel and conduct

■ Drobel is correct in asserting that competence to stand trial, by itself, "does not automatically enable an accused to waive the constitutional right to assistance of counsel and to conduct his or her own defense." *Lafferty*, 749 P.2d at 1248. However, we reject any implication that a separate finding of mental competence, apart from competence to stand trial, is necessary before a defendant may exercise the right of self-representation. To the extent the difference between competence to stand trial and competence to elect self-representation is vague, there exists no easily defined test of that difference.[18]

■ More important, we believe that the question of mental competence to elect self-representation is encompassed within the requirement that the choice to exercise that right be knowing and intelligent. As already explained, if the mental health of a defendant asking to proceed pro se is questionable, this constitutes a circumstance that must be addressed in determining whether the request is knowingly and intelligently made. Simply put, when faced with this circumstance, a trial court should consider whether the defendant, because of his or her mental condition, is incapable of knowingly and intelligently choosing self-representation.[19] This consideration may be assisted, at the court's discretion, by expert assessment of the defendant's mental condition, but such assistance is not mandated.

Because the question of mental competence to request self-representation is contained within the question of whether such a request is knowingly and intelligently made, we reframe Drobel's argument accordingly. Under our framework, Drobel's argument is that the trial court erred in finding that his self-representation request was knowingly and intelligently made, and therefore the court should not have granted the request.[20]

■ We review the trial court's determination that Drobel's request was knowing and intelligent under the "clearly erroneous" standard of Rule 52(a), Utah Rules of Civil Procedure. *See State v. Walker*, 743 P.2d 191, 193 (Utah 1987). We derive this approach from the Utah Supreme Court's treatment of the question of trial competency: upon proper interpretation of the controlling statute, the question of whether defendant is competent to stand trial is an issue of fact, reviewed under Rule 52(a). *Lafferty*, 749 P.2d at 1243–44. As applied in the context of a request to represent oneself, upon making the required inquiry into defendant's request, the trial court's finding resulting from that inquiry is also an issue of fact. We also note that Drobel bears the burden of proof on appeal, to demonstrate by a preponderance of the evidence that he should not have been allowed to waive his right to counsel. *Frampton*, 737 P.2d at 187.

■ An appellant raising issues of fact on appeal must, under Utah R.Civ.P. 52(a), marshal all the evidence supporting the trial court's findings, and then show that evidence to be insufficient. *Scharf v. BMG Corp.*, 700 P.2d 1068, 1070 (Utah 1985); *State v. Moore*, 802 P.2d 732, 738–39 (Utah App.1990). Here, Drobel has emphasized the poor judgment, grandiose expectations, possible delusions, and extreme religiosity that may have driven his desire to

one's own defense, suggested in *Westbrook*, has been superseded by the subsequent "knowing and intelligent" standard of *Faretta*.

**18.** One reason for the vagueness is the lack of any statutory definition of incompetence to assert the self-representation right, a problem not present with respect to competence to stand trial. See note 2.

**19.** This approach is implicit in *State v. Ruple*, 631 P.2d 874, 876 (Utah 1981) (inadequate colloquy with court, defendant had not finished twelfth grade, and suffered from minimal brain dysfunction and dyslexia, thus self-representation choice was not shown to be knowing and intelligent).

A defendant must, of course, be competent to stand trial in order to assert the self-representation right. *See Frampton*, 737 P.2d at 187 (self-representation right applies to a "competent accused").

**20.** We again note that although Judge Young did not explicitly state this finding in the record, the finding was implicit in the hearings and grant of Drobel's request.

represent himself. However, even assuming that these traits were symptomatic of a serious mental illness, such illness did not necessarily render him incapable of knowingly and intelligently choosing to represent himself. *See State v. Evans*, 125 Ariz. 401, 610 P.2d 35, 37 (1980) (paranoid schizophrenia does not automatically make defendant incapable of choosing to represent self). Here the record also reveals sufficient evidence to support the finding that Drobel, even if mentally ill, knowingly and intelligently asserted his right to self-representation.

The record shows that Drobel clearly identified self-representation as his right, and clearly asserted that right before trial. Drobel responded appropriately to the questions put to him by the trial court about his request, in terms of understanding what was asked and responding to the content of each question. He also was sufficiently alert to correct the trial court on the detail of his use of the term "imagination," rather than "creative defense." Additionally, when his request was granted, Drobel appropriately recognized that he would need extra time to prepare for trial, and sought a continuance.[21] Combined with the trial court's opportunity to assess demeanor and credibility, *see* Utah R.Civ.P. 52(a), Drobel's conduct in the trial court supports the finding that his request to represent himself was knowing and intelligent.

■ By implication, the experts' assessments of Drobel's competence to stand trial are also relevant to the question of whether he was able to knowingly and intelligently choose to represent himself. While the final consensus appears to be that Drobel is mentally ill, based on their overview of Drobel's behavior at the state hospital, at least some of the mental health experts suspected "a method to his madness," in the form of manipulative behavior. And,

although Dr. Lebegue's final evaluation turned out to be strikingly foresightful, the trial court was not bound to consider Drobel incapable of knowingly and intelligently asserting his self-representation right simply by virtue of attempting to assert it. Indeed, Dr. Lebegue's assessment that Drobel's cognitive capacity was intact supports a finding that Drobel was able to understand the risks of self-representation as presented by the trial judge, and thus made his choice "with eyes open." *Faretta*, 422 U.S. at 835, 95 S.Ct. at 2541.

■ While Drobel may have performed inadequately as his own attorney,[22] the conduct of his defense does not reflect an inability to knowingly and intelligently choose self-representation. His "motion to dismiss," while reflective of unrealistic, grandiose ideas, also raised at least three issues that are recognized under the law: the possibility of mistaken identity, the right to a speedy trial, and the need for adequate legal preparation. The document is also reasonably well organized, reflecting an author whose thinking is not so disordered as to render him incapable of making knowing and intelligent decisions.

Because the record contains evidence that Drobel's choice to represent himself was knowingly and intelligently made, there was no clear error in the trial court's finding that the choice was knowing and intelligent. Nor are we otherwise definitely and firmly convinced that a mistake was made in honoring that choice. *See Walker*, 743 P.2d at 193. In affirming the trial court's decision, we acknowledge the deference due to findings made by the trier of fact, upon consideration of the relevant factors, in cases as close and difficult as that presented here.

In sum, the trial court properly inquired into Drobel's wish to represent himself, and properly took Drobel's questionable

---

**21.** In this regard, in the exercise of its discretion, a trial court might justifiably deny a self-representation request, even when knowingly and intelligently made, if the grant of the request would cause a delay in trial. *State v. Garcia*, 92 Wash.2d 647, 600 P.2d 1010, 1015 (1979) (en banc).

**22.** The defendant who conducts his or her defense incompetently with respect to standards applied to attorneys cannot assert this incompetence as error on appeal. *Faretta*, 422 U.S. at 834 n. 46, 95 S.Ct. at 2541 n. 46; *Frampton*, 737 P.2d at 189.

mental health into account in considering the request. Because sufficient evidence exists to support a finding that Drobel's request was knowingly and intelligently made, we affirm the trial court's decision to grant the request.

## TRIAL PREPARATION RESOURCES

Drobel next contends that he was denied access to materials to prepare his defense, including an adequate law library, telephone contact with his standby counsel, and an interpreter. We agree with the State's contention that Drobel's argument is largely conclusory. Additionally, his argument is based on the mistaken assumption that his self-representation right carries with it certain privileges not afforded to pretrial detainees who are represented by professional counsel.

■ Drobel's trial preparation grievance was originally raised in his "motion to dismiss." In his motion, however, Drobel acknowledged that he had received photocopied legal materials from his standby counsel. Indeed, he directly quoted from Utah's rules of criminal procedure in his motion. Receipt of legal materials from standby counsel also indicates that, although it may not have been as frequent as he desired, Drobel both had and utilized contact with counsel. In claiming that his library access had been limited to one hour in a "useless" facility, and that he had been denied access to a "proper law library," Drobel neither specifies the amount of additional time in a proper library that he needed, nor the type of information he hoped to uncover. Nor does Drobel indicate that he was altogether denied telephone access. It appears that he expected some form of unrestricted telephone and legal research rights by virtue of his pro se

status. Such rights, however, are not part of the right of self-representation.

■ The choice to represent oneself does not automatically give defendant access to research resources enjoyed by professional counsel. *United States v. Sammons,* 918 F.2d 592, 601–02 (6th Cir.1990); *United States v. Wilson,* 690 F.2d 1267, 1270–73 (9th Cir.1982); *State v. Smith,* 66 Or.App. 374, 675 P.2d 1060, 1063 (1984). As observed in *Faretta v. California,* 422 U.S. 806, 835, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562 (1975), a pro se criminal defendant relinquishes "many of the traditional benefits associated with the right to counsel." Besides the wisdom, training, and experience of professional counsel, the benefits relinquished necessarily will include full access to legal materials, when the defendant remains in custody pending trial.

■ It has been noted that *Faretta*'s objective was not to promote fair trials, but to protect the right to self-representation. *See State v. Hoff,* 31 Wash.App. 809, 644 P.2d 763, 764 (1982) (the right to represent oneself is not essential for a fair trial, but protects defendant's "personal right to be a fool"); *People v. McDaniel,* 16 Cal.3d 156, 127 Cal.Rptr. 467, 472, 545 P.2d 843, 848 (1976). Because a choice to represent oneself amounts, in effect, to a choice to proceed to trial at a severe disadvantage, we agree that the "hard reality" of that choice includes both one's own ignorance of the law and the likelihood that independent legal research opportunities will be limited. *State v. Seifert,* 423 N.W.2d 368, 373 (Minn.1988) (quoting *Bell v. Hopper,* 511 F.Supp. 452, 453 (S.D.Ga. 1981)). Drobel, having voluntarily, knowingly, and intelligently made his choice, must accept the hard realities entailed in it.[23]

23. We approve of the trial court's approach in *United States v. Pina,* 844 F.2d 1, 5–6 (1st Cir. 1988), where limited access to legal materials was among the risks explained to a prospective pro se defendant. Once the choice of self-representation is made in the face of this warning, the pro se defendant is hard-pressed to complain that the choice was not effectively exercised because of the lack of access to legal materials.

Certainly a trial court might, in its discretion, order some extra telephone privileges, or access to legal materials for an incarcerated pro se defendant. *See, e.g., Milton v. Morris,* 767 F.2d 1443, 1445–47 (9th Cir.1985). Such order, however, should have clear limits, and should only be entered upon consideration of jail security needs.

■ Drobel also argues that the trial court inadequately considered his request for an interpreter. Rule 15(b), Utah Rules of Criminal Procedure, provides that a trial court "may appoint an interpreter of its own selection...." While this decision is a matter of discretion, our supreme court has held that it is better, in a questionable case, to err on the side of providing an interpreter. *State v. Vasquez*, 101 Utah 444, 121 P.2d 903, 906 (1942). *Compare State v. Mendez*, 56 Wash.App. 458, 784 P.2d 168, 170–71 (1989) (interpreter required only where defendant is not fluent in English); *State v. Perrigo*, 10 Kan.App.2d 651, 708 P.2d 987, 989 (1985) (failure to appoint interpreter requires reversal only in extreme cases). Failure to appoint an interpreter, however, is reversible error only when the record shows that the defendant's presentation of the case has thereby been hampered. *Vasquez*, 121 P.2d at 906.

■ Here the record reflects that Drobel had no difficulty in expressing himself to the court in English. By his own account, he was schooled in the language, had used it to conduct business, and had used it during seven years in the United States. Indeed, his request was made only upon the trial court's observation that he was fluent in English. Upon inquiry into his request, Drobel clarified that his main concern was with legal terminology. To allay that problem, he had standby counsel. Therefore, the trial court did not abuse its discretion in refusing to provide an interpreter for Drobel.

Drobel has neither adequately specified the deficiencies in his trial preparation resources nor convinced us that he had any particular special rights to such resources as a result of electing to conduct his own defense. Accordingly, we hold that he was not unduly handicapped in his efforts to prepare for trial.

### CREDIT FOR PRETRIAL INCARCERATION

■ Finally, Drobel argues that the trial court violated his equal protection right by not granting him credit toward his prison sentence for time spent at the Utah State Hospital and in jail. Focusing on the hospital time, Drobel characterizes his argument as basically one of fairness, in that he, as a mentally ill inmate, should not be denied credit for pretrial incarceration simply because much of his incarceration was in the state hospital instead of jail. This argument, however, is not properly before this court.

In *State v. Schreuder*, 712 P.2d 264, 277 (Utah 1985), our supreme court held, consistent with its prior opinions, that the power to reduce an indeterminate sentence or grant credit for pretrial incarceration rests exclusively with the Utah Board of Pardons. *Id.* at 277. Subsequently, in *State v. Richards*, 740 P.2d 1314, 1317 (Utah 1987), the supreme court held that the equal protection clause requires that a defendant receive sentence credit for pretrial incarceration resulting from the inability to post bail. This court, in *State v. Alvillar*, 748 P.2d 207, 209–10 (Utah App.1988), commented that the *Richards* decision might have signalled some inclination by the supreme court to retreat from its position in *Schreuder*.

Three years have passed since *Alvillar*, however, during which there has been no further sign of a retreat from *Schreuder*, if indeed *Richards* ever was such a sign. Accordingly, we find *Schreuder* controlling, and hold that Drobel must present his case for pretrial incarceration credit to the Board of Pardons.

### CONCLUSION

For the foregoing reasons, Drobel's conviction is affirmed, and his concerns about credit for pretrial incarceration should be presented to the Board of Pardons.

BENCH, P.J., and ORME, J., concur.