**Franco LOPEZ, a/k/a Eduardo T. Hernandez, Petitioner–Appellant,**

v.

**S. Frank THOMPSON, Respondent–Appellee.**

No. 97–35837.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 16, 1998

Filed April 27, 1999

Rehearing En Banc Granted and Opinion Withdrawn Sept. 20, 1999.

Argued and Submitted Nov. 18, 1999.

Filed Feb. 4, 2000

**1112**

Leland R. Berger, Portland, OR, for petitioner-appellant.

Richard D. Wasserman, Assistant Attorney General, Salem, OR, for respondent-appellee.

Before: HUG, Chief Judge, WALLACE, REINHARDT, BRUNETTI, FERNANDEZ, T.G. NELSON, KLEINFELD, HAWKINS, TASHIMA, SILVERMAN, and McKEOWN, Circuit Judges.

Opinion by Judge McKEOWN; Concurrence by Judge WALLACE; Dissent by Judge TASHIMA.

McKEOWN, Circuit Judge:

The question before us is whether Franco Lopez knowingly and intelligently waived his right to assistance of counsel at sentencing in accord with *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). Resolution of this question requires us to consider two important, and often competing, constitutional rights applicable to a criminal proceeding: the right to assistance of counsel and the correlative right to waive assistance of counsel. Under the circumstances of this case, which included two hearings and a written waiver, we conclude that Lopez did knowingly and intelligently waive his right to counsel and choose self-representation.[1] We thus affirm the district court's denial of Lopez's petition for writ of habeas corpus brought under 28 U.S.C. § 2254.

## BACKGROUND AND PRIOR PROCEEDINGS

This case originated in state court in Multnomah County, Oregon, and stems from Lopez's sexual assault of the 11–year–old daughter of a woman with whom he was living. Represented by counsel, Lopez pleaded no-contest to three counts of sodomy in the first degree and one count of sex abuse in the first degree. Two hearings—the plea hearing and the hearing on Lopez's motion to remove counsel—as well as Lopez's written waiver of counsel bear on this appeal.

**Plea Hearing**

At the plea hearing on October 25, 1989, Lopez was represented by attorney William Brennan. Judge Haas apprised Lopez of the charges, the possible prison terms and fines for each count, and the possibility of probation. Lopez indicated that he understood:

> The Court: The charges against you are sodomy in the first degree, two counts; sex abuse in the first degree; sodomy in

---

1. A panel of this Circuit earlier reached the same conclusion. We granted rehearing en banc. *Lopez v. Thompson*, 175 F.3d 1120, *withdrawn and reh'g en banc granted*, 187 F.3d 1160 (9th Cir.1999).

the first degree. Each one of these is punishable by imprisonment of 20 years in prison with a ten year minimum. Further, [there is] a $100,000 fine on each one of them and the sex abuse in the first degree is punishable by five years with a two and a half year minimum and $100,000 fine. Those sentences could run concurrent and they could run consecutive. Some of them you could be sentenced to the penitentiary and others you could be placed on probation. Do you understand that?

Mr. Lopez: Yes sir.

At the hearing, the deputy district attorney advised that the state would seek a "dangerous offender" charge.[2] The judge explained to Lopez that if such a charge were sought, then a psychiatrist would examine him to recommend whether he should be classified as a dangerous offender. In a colloquy involving the judge, the deputy district attorney, and Brennan, Lopez was told that if he were classified as a dangerous offender, his sentence on one count would increase from a range of 10–20 years to a range of 15–30 years. Again, Lopez acknowledged that he understood:

Deputy District Attorney: Does the Court need to advise of a dangerous offender?

The Court: Yes, I am getting down to that. The District Attorney stated that what we are going to do in reference to this case is there will be—as I understand it, there will be dismissal of charges, is that right?

Deputy District Attorney: There is [sic] four charges and we would seek a dangerous offender on only one charge.

Mr. Brennan: Rather than multiple.

Deputy District Attorney: Rather than seeking consecutive.

The Court: We will await a PSI and they would seek one dangerous offender charge. On the dangerous offender charge, what happens if they seek that, what I do is appoint a psychiatrist who interviews you and gives you an examination and they make a recommendation whether or not you have a sustained potential for dangerous offender treatment. If you do[,] that means the Court on that count can sentence you to a maximum of 30 years to the State Corrections Division. Do you understand that? That is an issue in this case.

Mr. Lopez: I understand, sir.

Deputy District Attorney: Your Honor, should we indicate there is a potential 15 year minimum on that?

The Court: Yes. There is a 15 year minimum on that also.

Mr. Brennan: Just for clarification, the way I explained it to [Lopez] is that would only enhance one of the 20 year sentences from 20 to 30 and from ten year minimum to a 15 year minimum if the Court were to find him a dangerous offender, only if.

The Court: Yes. . . .

### Hearing on Motion to Remove Counsel

Eight days later, on November 2, 1989, Lopez appeared before a different judge, Judge Roth, for another hearing. The subject of the hearing was Lopez's motion to remove Brennan—Lopez's fourth attorney in a succession of counsel[3]—as his counsel for the sentencing proceeding. Lopez insisted to the court that he desired to proceed to the sentencing hearing without representation of counsel. Brennan recommended against Lopez's self-representation at sentencing and explained to Judge Roth in open court, in Lopez's presence, that to determine dangerous offender status, psychiatrists would evaluate Lopez and then either testify or submit reports to the judge:

Mr. Brennan: . . . . We were in front of Judge Haas, and Mr. [Lopez] entered a pleading of no-contest on the underlying case. Sentencing was set for the 27th of November . . . [;] and [as to] the fugitive matter which is I believe the second

---

2. *See* OR. REV. STAT. § 161.725.

3. Lopez had already successfully moved to replace three previous lawyers.

case down on your docket, ... Judge Haas indicated that he would hear that matter at the conclusion of sentencing. Mr. [Lopez] has informed me that he wants to fire me and would like to represent himself.

Deputy District Attorney: Your honor, I should inform the court the state is opposed to any change ... [;] this would make the fifth attorney for this defendant: Mr. Levy, Mr. Ravio, Mr. Ameras ..., and Mr. Brennan have all been on this case and all have had difficulty with the defendant....

The Court: What charges does he have?

Deputy District Attorney: He has a fugitive matter and a number of Sodomy charges.

Mr. Brennan: He has three counts of Sodomy in the First Degree ... and one count of Sex Abuse in the First Degree.... [T]he District Attorney ... would be recommending a dangerous offender treatment on one count, one count only. I have contacted Dr. Frank Collistro to evaluate Mr. [Lopez]. That is in place, and also Dr. David Meyers would be ... evaluating Mr. [Lopez], ... and the two would then submit their reports to Judge Haas or testify as the case may be on that issue. I really think that Mr. [Lopez] would be better served by having an attorney to assist him rather than representing himself....

Judge Roth then turned his attention to Lopez, inquired about his background, and told him that he should have legal advice:

The Court: .... Mr. [Lopez], .... How old are you?

Mr. Lopez: 30 years old, sir.

The Court: And how much education do you have? Formal education. Schooling.

Mr. Lopez: Schooling?

The Court: Yes.

Mr. Lopez: High School.

The Court: Where?

Mr. Lopez: El Paso, Texas.

The Court: Any law training at all?

Mr. Lopez: I have some paralegal experience, sir.

\* \* \*

The Court: Well, here, here's the problem[,] Mr. [Lopez]. I know Mr. Brennan. Mr. Brennan is a lawyer and he's going to do the best he can for you.... [Y]ou've had other lawyers, and you are not a lawyer yourself. And the old saying is, even when a lawyer represents himself, he has a fool for a client.... [S]o, it just doesn't work too well. You got to have legal advice and you got serious charges here.

Mr. Lopez: I understand that.

Brennan subsequently interceded again with a recommendation that counsel be appointed for Lopez:

*Mr. Brennan: .... I do think he needs counsel ... and I would ask the court to appoint someone else. At this point I feel there is a real rift between Mr. [Lopez] and myself. And I think, I'm not sure what the outcome will be in the sentencing on this....*

Later in the hearing, as the judge was inquiring about whether he wanted to represent himself, Lopez began talking about crimes he had committed in Texas. The judge again advised Lopez about the dangers of self-representation:

The Court: Now I don't want to get into the whole thing. Now all I want to do is, I'm listening to you and uh, uh, you want to represent yourself? Is that what you want?

Mr. Lopez: Well, if I have to. Yes, I would.

The Court: What do you mean you have to? Now you're having sort of second thoughts.

Mr. Lopez: No, no, now if you're going to put it that way, yes I will represent myself. The thing is, is that, your honor, this woman had hired me to murder her husband and this is the information that I have withheld from my attorney and from the district attorney's office.

Mr. Brennan: Mr. [Lopez], at this point I would advise you to remain silent.

The Court: Yes, I think this is . . .

Mr. Brennan: I strongly advise you to remain silent[;] I'm going on the record with that.

The Court: Yeah, now I . . .

Mr. Brennan: Follow my advice.

Mr. Lopez: I want this on the record because I want to put this out, evidently you're not representing me any-more . . . .

Mr. Brennan: I'm still representing you until the court allows me to withdraw.

The Court: Yes, I am advising you Mr. [Lopez], you're not doing yourself any good putting this all down. I just, I just tell yea [sic], uh, uh, now if this is the type of representation your [sic] going to make for yourself, your [sic] going to put a noose around your neck.

Mr. Lopez: . . . . I'm not putting no noose around my neck, I'm just bringing up what the truth is.

The hearing came to a close only after the judge asked Lopez six more times whether he wanted to represent himself and whether he understood the import of the judge's warnings:

The Court: Do you really want to represent yourself? You have a constitutional right to represent yourself as well as the right to have a lawyer.

Mr. Lopez: Yes, sir, if I may.

The Court: Now this is your decision.

Mr. Lopez: Yes.

The Court: Now you have been fully advised.

Mr. Lopez: I'm fully advised.

The Court: You know you have serious charges. You already entered a plea. So you got to know where you are. Uh, Judge Haas probably will not let you withdraw your plea of no-contest. You are coming up with sentencing. You know that.

Mr. Lopez: Yes.

The Court: You have only a couple of remedies as to make a strong pitch when you argue when you come up for sentencing before Judge Haas. Or to make a real pitch to say that I want to withdraw my plea and go to trial. That's where you are. Do you understand that?

Mr. Lopez: Yes, sir.

The Court: Now, is this what you want to do and represent yourself and try to handle this type of situation?

Mr. Lopez: Yes, sir.

The Court: Alright.

On the same day, Lopez signed a written "Waiver of Right to Attorney," which confirmed his understanding that an attorney could help him:

1) Investigate my case, call witnesses, and obtain evidence.

2) Research the law and raise constitutional issues . . . .

3) Know and explain courtroom procedures and argue my case, or

4) Plea bargain for a reduced charge or sentence with the District Attorney.

The waiver also cautioned, "I understand that, if I waive my right to an attorney, I give up that help and will have to do these things myself." Judge Roth granted Lopez's motion to remove Brennan.

**Other Proceedings**

Lopez then appeared without counsel at his sentencing hearing, which was held before Judge Haas. At sentencing, Lopez did not cross-examine the psychiatrist, who performed the dangerous offender evaluation, and indicated that he was confused and needed the assistance of counsel. Judge Haas denied Lopez's request for counsel, declared him a "dangerous offender," and sentenced him to 15–30 years on that count. On the remaining three counts, the judge sentenced Lopez to consecutive prison sentences of 10–20, 10–20, and 2 1/2–5 years.

Lopez appealed his conviction to the Oregon Court of Appeals, which affirmed without opinion. *State v. Lopez,* 106 Or. App. 776, 810 P.2d 881 (1991). No appeal was taken to the Oregon Supreme Court.

Lopez later filed for post-conviction relief in Marion County, Oregon, but was denied relief. The Oregon Court of Appeals affirmed without opinion, *Lopez v. Maass*, 128 Or.App. 695, 877 P.2d 678 (1994), and the Oregon Supreme Court denied review. *Lopez v. Maass*, 320 Or. 325, 883 P.2d 1303 (1994).

Lopez filed a petition for writ of habeas corpus on February 28, 1995, alleging ineffective assistance of counsel, violation of his right against double jeopardy, denial of due process, and denial of the right to counsel at sentencing. The district court denied the petition, adopting the magistrate's findings:[4]

> The court finds from a review of this record that the trial court advised petitioner of the disadvantages and dangers of representing himself, and that petitioner understood the ramifications of proceeding without counsel. Accordingly, the court finds that petitioner's waiver of his right to counsel was valid.

On appeal, Lopez contends that his waiver of counsel at sentencing must be examined "in the context of an Oregon Dangerous Offender proceeding" and that it was not knowing and intelligent because

> [a]t no time did Judge Roth specifically advise [him] that he could have a lawyer assist him in deciding whether he wanted to cooperate with the evaluation process[,] .... that he could have a lawyer present during the evaluation[,] .... that he had the right to confront and cross-examine the doctor who performed the evaluation[,] .... [and] that he had the right to have a lawyer help him with the difficult task of effectuating this confrontation right by effectively cross-examining the doctor.

## ANALYSIS

■ We review de novo a district court's order to grant or deny a petition for writ of habeas corpus.[5] *McKenna v. McDaniel*, 65 F.3d 1483, 1490 (9th Cir. 1995). Whether a waiver of the Sixth Amendment right to counsel was made knowingly and intelligently is a mixed question of law and fact that is also reviewed de novo. *United States v. Robinson*, 913 F.2d 712, 714 (9th Cir.1990); *Harding v. Lewis*, 834 F.2d 853, 857 (9th Cir. 1987). Habeas corpus relief is appropriate where the state court committed an error that had a " 'substantial and injurious [e]ffect or influence' " on the outcome of the proceedings. *McKenna*, 65 F.3d at 1490 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 627, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)). The state court's factual findings are entitled to deference, 28 U.S.C. § 2254, and the district court's factual findings are reviewed for clear error. *McKenna*, 65 F.3d at 1490.

Also important to our analysis is the posture of this case, which comes to us on collateral review of Lopez's conviction in state court, not on direct review of a conviction in federal district court. In this context, our inquiry is limited to whether Lopez was sentenced in violation of the United States Constitution. *See Smith v. Phillips*, 455 U.S. 209, 221, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982) (holding that "[a] federally issued writ of habeas corpus ... reaches only convictions obtained in violation of some provision of the United States Constitution"). Quoting from *Cupp v. Naughten*, 414 U.S. 141, 146, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973), in *Smith* the Su-

---

**4.** As the panel opinion stated, 175 F.3d at 1124 n. 1, the magistrate judge determined that Lopez had procedurally defaulted the double jeopardy and due process claims and rejected the ineffective assistance of counsel and right to counsel at sentencing claims on the merits. The district court adopted the magistrate judge's recommendations and dismissed Lopez's petition on July 18, 1997. The state did not raise the issue of procedural default before this court.

**5.** Lopez filed his petition on February 28, 1995, prior to the April 24, 1996 effective date of the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, 110 Stat. 1214 ("AEDPA"). Therefore, AEDPA's amendments do not apply to his petition. *Lindh v. Murphy*, 521 U.S. 320, 323, 336, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997).

preme Court articulated the parameters of our review:

> Before a federal court may overturn a conviction resulting from a state trial . . . it must be established not merely that the [State's action] is undesirable, erroneous, or even "universally condemned," but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment.

*Smith,* 455 U.S. at 221, 102 S.Ct. 940.

 The Sixth Amendment provides that "the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. CONST. amend. VI. In felony cases, a criminal defendant is entitled to be represented by counsel at all critical stages of the prosecution, including sentencing. *See Mempa v. Rhay,* 389 U.S. 128, 134–37, 88 S.Ct. 254, 19 L.Ed.2d 336 (1967). *Faretta* articulates what the Sixth Amendment requires for a valid waiver of the right to counsel and is thus our benchmark on collateral review of state court proceedings. There is no question that Lopez had a Sixth Amendment right to counsel at his sentencing hearing. There is also no question that Lopez had a correlative right to waive assistance of counsel and represent himself. *Faretta,* 422 U.S. at 807, 95 S.Ct. 2525.. The question we must address is whether Lopez's waiver met the *Faretta* standard:

> When an accused manages his own defense, he relinquishes, as a purely factual matter, many of the traditional benefits associated with the right to counsel. For this reason, in order to represent himself, the accused must "knowingly and intelligently" forgo those relinquished benefits. Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will estab-

lish that "he knows what he is doing and his choice is made with eyes open."

*Id.* at 835, 95 S.Ct. 2525 (citations omitted).

In applying *Faretta,* consistent with our authority, we have suggested, but not mandated, a preferred procedure for federal district courts to follow:

> [A] district court should not grant a defendant's request to waive representation of counsel and serve as his own counsel, without discussing with the defendant, in open court, whether the waiver was knowingly and intelligently made, with an understanding of the charges, the possible penalties, and the dangers of self-representation. This is clearly the preferable procedure and should be followed by district courts in every case.

*United States v. Harris,* 683 F.2d 322, 324 (9th Cir.1982); *see also United States v. Farhad,* 190 F.3d 1097, 1099–1100 (9th Cir. 1999); *United States v. Balough,* 820 F.2d 1485, 1488 (9th Cir.1987).

██ In addition, in several cases arising in state court we have imposed this procedure but cited to our cases on direct review. *See, e.g., Harding v. Lewis,* 834 F.2d 853, 857 (9th Cir.1987); *Snook v. Wood,* 89 F.3d 605, 612–13 (9th Cir.1996). We have not indicated, however, that this particular procedure is constitutionally required. It is now time to clarify our position with respect to state habeas cases. Neither the Constitution nor *Faretta* compels the district court to engage in a specific colloquy with the defendant. Because we cannot impose a procedural framework on state courts unless compelled by the Constitution,[6] we need not address whether the suggested colloquy was followed here.

██ We now turn to an analysis of the record to determine if the trial court made Lopez "aware of the dangers and disadvantages of self-representation." *Id.* at

---

6. *See Smith,* 455 U.S. at 221, 102 S.Ct. 940 ("Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension.").

835, 95 S.Ct. 2525. We conclude, after reviewing the record as a whole—including the two extensive hearings held within eight days of each other and the written waiver—that the trial court fulfilled its duty. Lopez "kn[ew] what he [wa]s doing," and his choice was "made with eyes open"—he knowingly and intelligently waived his right to representation. *Id.*

At the plea hearing and the subsequent hearing to remove his counsel, Lopez was informed of the nature of the charges and proceedings against him, the possible sentences that might be imposed (including possible sentence enhancements), and the dangers of self-representation. In addition, Lopez was informed that psychiatrists would testify at the sentencing hearing on the dangerous offender issue. Finally, Lopez's attorney and Judge Roth repeatedly told Lopez that he faced significant dangers if he chose to proceed without the assistance of counsel. Notwithstanding these and other warnings, Lopez persisted in his desire to represent himself; he even acknowledged that he was aware of the potential pitfalls of self-representation.

The judge took care to ensure that Lopez meant what he said. At one point early in the colloquy at the second hearing, Lopez said he would represent himself "if I have to." Recognizing that this response was equivocal, the judge proceeded to ask Lopez six more times whether he really wanted to represent himself and whether he understood the import of the judge's warnings. Lopez answered affirmatively each time. The dialogue between the judge and Lopez concluded:

> The Court: Now, is this what you want to do and represent yourself and try to handle this type of situation?
>
> Mr. Lopez: Yes, sir.
>
> The Court: Alright.

That some of the court's admonitions were colloquial does not detract from their force or effect. On the contrary, they may have brought home the point more clearly. For example, Judge Roth warned Lopez, "if this is the type of representation your [sic] going to make for yourself, your [sic] going to put a noose around your neck." Although the court did not list, bullet-style, the various disadvantages of proceeding without counsel, the court's warnings nevertheless communicated powerfully to Lopez the disadvantages of proceeding pro se, which is all that *Faretta* requires. *See Faretta*, 422 U.S. at 825, 95 S.Ct. 2525. *Cf. United States v. Poynter*, 489 F.Supp. 604, 605 (S.D.N.Y.1980) ("In order to impress the vast majority of defendants, talking plainly, with colloquial expressions liberally interspersed, is an imperative.").

In context, the court's comment about the noose communicated to Lopez that he was making the very type of mistake that he might suffer in the absence of counsel. The judge's admonitions made clear that, without counsel, Lopez was at a disadvantage precisely because he did not understand the intricacies of the proceeding.[7]

In addition to the special persuasive force of these verbal warnings, Lopez enjoyed the benefit of the written waiver, which listed the advantages of counsel with some specificity. On appeal, Lopez characterizes the written waiver as a "pre-printed boilerplate form" but does not challenge its validity. Indeed, the waiver *was* a general one, applying to the pre-trial context, but most of its examples of the advantages of counsel pertain to sentencing as well, such as, "call witnesses, and obtain evidence," "[r]esearch the law and raise constitutional issues," and "[k]now and explain courtroom procedures and argue my case." We do not place undue emphasis on the written waiver but rather regard it as one among many factors supporting waiver. As a whole, then, the

---

7. The extensive colloquy, admonitions, and pointed language can hardly be dismissed as "judicial sermonizing" or "ritualistic formula" as suggested by the dissent. If this was a sermon, then the judge was preaching to a knowing choir. Once informed of the consequences, Lopez certainly knew and understood the risks of self-representation.

record satisfies *Faretta*: the verbal exchanges and the written waiver together ensured that Lopez "kn[ew] what he [wa]s doing" and that "his choice [wa]s made with eyes open." *Faretta*, 422 U.S. at 835, 95 S.Ct. 2525.

■ Finally, Lopez argues that his waiver was not knowing and intelligent because he should have been advised of his rights "in the context of an Oregon Dangerous Offender proceeding" and because Judge Roth did not "specifically advise [him] that he had the right to confront and cross-examine the doctor who performed the evaluation." This argument is without merit. Although *Faretta* announced a constitutional right to self-representation, it mandated no specific litany or formula to ensure that waivers of counsel are knowing and intelligent.

We heed the Supreme Court's teaching that our waiver analysis must be pragmatic and directed to the "particular stage of the proceedings in question":

> [W]e have taken a more pragmatic approach to the waiver question—asking what purposes a lawyer can serve at the particular stage of the proceedings in question, and what assistance he could provide to an accused at that stage—to determine the scope of the Sixth Amendment right to counsel, and the type of warnings and procedures that should be required before a waiver of that right will be recognized.

*Patterson v. Illinois*, 487 U.S. 285, 298, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988). This does not mean, however, that the judge serves as a surrogate lawyer for the defendant. Under the circumstances here, the only remaining proceeding was the sentencing hearing. The trial court directed its comments to waiver of counsel for sentencing and likewise our analysis is not a general one but is focused on counsel's role "at [this] particular stage of the proceedings." *Id.*

■ Faretta requires no specific admonition regarding the right to cross-examine witnesses at a sentencing hearing. And Lopez's claim that the court should

have specifically instructed him on the Oregon statute would have demanded tutelage and legal advice by the trial court, a result not countenanced by *Faretta*. *Faretta* imposes no requirement to assess "how well or poorly [a defendant] mastered the intricacies" of evidence and state law. *Id.* at 836, 95 S.Ct. 2525. In fact, a defendant's technical knowledge is "not relevant to an assessment of his knowing exercise of the right to defend himself." *Id.* As the Supreme Court recently stated, "the trial judge is under no duty to provide personal instruction on courtroom procedure or to perform any legal 'chores' for the defendant that counsel would normally carry out." *Martinez v. Court of Appeal of California*, —— U.S. ——, 120 S.Ct. 684, 691, 145 L.Ed.2d 597 (2000). In assessing waiver of counsel, the trial judge is required to focus on the defendant's understanding of the importance of counsel, not the defendant's understanding of the substantive law or the procedural details. What is required is that a defendant "be made aware of the dangers and disadvantages of self-representation" and that the defendant "'knowingly and intelligently' forgo those relinquished benefits." *Faretta*, 422 U.S. at 835, 95 S.Ct. 2525. Looking at the record in this case as a whole, these requirements have been satisfied.

AFFIRMED.

WALLACE, Circuit Judge, concurring:

I concur in the majority's holding that Lopez knowingly and intelligently chose to represent himself after being made aware of the dangers and disadvantages of self-representation. *See Faretta v. California*, 422 U.S. 806, 835, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). I also concur that the district court's *Faretta* warnings were pragmatic and directed to the "particular stage of the proceedings in question" pursuant to *Patterson v. Illinois*, 487 U.S. 285, 298, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988).

I point out that the Third and Eighth Circuits, following *Patterson*'s teachings,

**1120**

hold that *Faretta* warnings given before sentencing do not have to be as extensive as those given at trial. Citing *Patterson*, the Eighth Circuit stated: "Sentencing hearings demand much less specialized knowledge than trials; for instance, the Federal Rules of Evidence do not apply in sentencing hearings." *United States v. Day*, 998 F.2d 622, 626 (8th Cir.1993); *see also United States v. Marks*, 38 F.3d 1009, 1015 (8th Cir.1994) (same). Similarly, the Third Circuit, while acknowledging that "sentencing is a critical and often times complicated part of the criminal process that contains subtleties which may be beyond the appreciation of the average layperson," *United States v. Salemo*, 61 F.3d 214, 220 (3d Cir.1995), stated that *Faretta* warnings given before sentencing "need not be as exhaustive and searching as similar inquiry before the conclusion of trial." *Id.* at 219.

The panel majority opinion in this case relied upon *Day* and *Salemo* to reject Lopez's narrow argument that, in its *Faretta* discussion, the state court should have specifically explained to Lopez the nuances of the psychiatric examination that would occur before the sentencing hearing and the possible need to cross-examine psychiatrists at the sentencing hearing. *See Lopez v. Thompson*, 175 F.3d 1120, 1127 (9th Cir.1999), *citing Salemo*, 61 F.3d at 219–20; *Day*, 998 F.2d at 626. As a member of the panel majority, I remain convinced of that position. A proper reading of *Patterson* would result in the analysis of the Third and Eighth Circuits and an application like that of the panel majority.

Despite the clear statement in *Patterson* that the dangers and disadvantages of self-representation, and the corresponding warnings that must be given, depend upon the stage of a criminal proceeding in which a defendant finds himself, the Ninth Circuit has never, until this opinion, varied its approach to reviewing *Faretta* cases after *Patterson*, on either direct or collateral review, based upon the stage in the criminal proceeding. In most of the post-*Patterson* cases, *Faretta* warnings were given before or during trial. *See United States*

*v. Farhad*, 190 F.3d 1097, 1098 (9th Cir. 1999), *cert. denied*, ― U.S. ―, 120 S.Ct. 1428, ― L.Ed.2d ― (2000); *United States v. Keen*, 104 F.3d 1111, 1113 (9th Cir.1996); *United States v. Springer*, 51 F.3d 861, 863 (9th Cir.1995); *United States v. Arlt*, 41 F.3d 516, 517 (9th Cir.1994); *United States v. Van Krieken*, 39 F.3d 227, 229 (9th Cir.1994); *United States v. Mohawk*, 20 F.3d 1480, 1483 (9th Cir.1994); *United States v. Lorenzo*, 995 F.2d 1448, 1452 (9th Cir.1993); *United States v. Robinson*, 913 F.2d 712, 713 (9th Cir.1990); *United States v. Flewitt*, 874 F.2d 669, 671–72 (9th Cir.1989). *Faretta* warnings given before or at trial should be the most "rigorous." *Patterson*, 487 U.S. at 298, 108 S.Ct. 2389. In other Ninth Circuit post-*Patterson* cases, the *Faretta* inquiry was made at a different time, but our review was no different than when the inquiry was made before or during trial. *See Snook v. Wood*, 89 F.3d 605, 607–08 (9th Cir.1996) (during appeal); *Moran v. Godinez*, 57 F.3d 690, 694 (9th Cir.1995) (before entering guilty plea); *Hendricks v. Zenon*, 993 F.2d 664, 668 (9th Cir.1993) (appeal); *United States v. Fuller*, 941 F.2d 993, 994 (9th Cir.1991) (before entering guilty plea). However, *Faretta* warnings given at other times need not be as rigorous as those given at trial. *See Patterson*, 487 U.S. at 298–300, 108 S.Ct. 2389. Pursuant to *Patterson* and this en banc case, our circuit should now take into account the stage in the criminal proceedings at which a district court's *Faretta* inquiry is made in our review of *Faretta* cases, whether on direct or collateral review.

Finally, I agree with the majority that we have no habeas corpus power to designate "preferred procedures" for state courts to follow. But in acknowledging this rule, the majority, unfortunately, states that we have power to designate preferred procedures that federal district courts are to follow. I must disassociate myself from the majority opinion's reference to this court's "authority" to establish a "preferred procedure" for federal trial courts to follow in applying *Faretta*. *See*

majority op. at 1117. What is the basis for this "authority"? The opinion does not explain; I believe it does not exist. As an en banc court, we should not perpetrate this error; indeed, we should reject it.

The specific "preferred procedure" to which the opinion refers has a somewhat convoluted history. In *United States v. Dujanovic*, 486 F.2d 182, 186 (9th Cir. 1973), we said, in reviewing a pre-*Faretta* defendant's request to represent himself:

> We cannot visualize a less minimal requirement than the District Court shall not grant a request to waive counsel and proceed pro se without addressing the accused personally and determining on the record that the demand to waive counsel and proceed pro se is competently and intelligently made with understanding of the nature of the charge and the penalties involved.

The following year, in *Cooley v. United States*, 501 F.2d 1249 (9th Cir.1974), also a pre-*Faretta* case, we emphasized that this statement "is obviously admonitory rather than a rule of decision. While the procedure described may be preferred, its omission is not, per se, reversible error, where it appears from the whole record that the defendant knew his rights and insisted upon representing himself." *Id.* at 1252 (citation omitted). Later, in *United States v. Bird*, 621 F.2d 989, 991 (9th Cir.1980), after *Faretta*, we "stressed that the trial court should" follow the preferred procedure, but acknowledged that failure to do so was not per se reversible error. However, in *United States v. Harris*, 683 F.2d 322, 324 (9th Cir.1982), a panel of this court stated that the *Dujanovic* procedure "is clearly the preferable procedure and should be followed by district courts in every case." *See also United States v. Rylander*, 714 F.2d 996, 1005 (9th Cir. 1983). The court in *United States v. Balough*, 820 F.2d 1485, 1488 (9th Cir.1987), followed *Harris*, stating that the "preferred procedure to ensure that a waiver is knowingly and intelligently made is for the district court to discuss [the nature of the charges against him, the possible penalties, and the dangers and disadvantages of self-representation] with the defendant in open court." It has now become quite commonplace for us to cite to *Balough* and the "preferred procedure" in *Faretta* cases. *See, e.g., Farhad,* 190 F.3d at 1099.

As we emphasized in *Cooley*, the so-called preferred procedure "is obviously admonitory" only and is not mandatory. *Cooley,* 501 F.2d at 1252. The district courts should base their *Faretta* inquiry upon the constitutional standards outlined in *Faretta* itself, and may be guided by our decisions as to what level of inquiry is or is not reversible error. However, stating a *preferred* procedure implies that there are other procedures that are not erroneous (i.e., no reversal for following them), but our view is that a particular procedure is preferable. *See, e.g., Harding v. Lewis,* 834 F.2d 853, 858–59 (9th Cir.1987); *Cooley,* 501 F.2d at 1252. By what authority?

We have no authority to prescribe rules or preferred procedures for district courts to follow in *Faretta* cases or any other type of case. Pursuant to Article III, section 2 of the Constitution, the judiciary's role is to resolve cases and controversies. *See also* 28 U.S.C. § 46(b). In doing so, we have jurisdiction "of appeals from all final decisions of the district courts," 28 U.S.C. § 1291, and are to determine whether there is or is not reversible error in those final decisions. Our role is not, however, to dictate preferred procedures to the district courts or become law professors opining what we think best. Our role is "to say what the *law* is," *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803) (emphasis added), not what "preferred procedures" the district courts should follow.

When courts are involved with making rules and procedures, it occurs pursuant to clear statutory authority from Congress, with public notice and comment, and finally by majority vote of the entire court. For instance, the Judicial Conference of the United States recommends rule changes to the United States Supreme Court which can then refer approved

changes to the Congress for its consideration. *See* 28 U.S.C. §§ 331, 2072. We can make local rules "for the conduct of [our] business," *id.* § 2071(a), but those rules apply only to this court and can only be made or amended after public comment and by a majority vote of judges in regular active service, *see id.* § 2071(b); Fed. R.App. P. 47(a)(1), not a panel of three. But whence comes the power of three or eleven judges from this court to require district courts to follow self-generated rules in the form of "preferred procedures"?

While our court is theoretically in the best position to rule on legal issues, we do not have a similar better view for procedure to be followed in the district court. Some of our judges have never been district court judges, and those who were become distanced from their district court experiences year by year. Institutionally, a court of appeals panel is not in the best position to make pronouncements of "better procedures": that should be left to the district courts, which interact with litigants and counsel face to face, day by day, assuming that the procedures they use satisfy constitutional and statutory requirements. Our job is to ensure the latter, not to prescribe the former.

For all of these reasons, I disassociate myself from the suggestion that we have a chancellor's foot over *Faretta* procedures to be followed in the district court. An en banc court has never acknowledged that such power exists until now. I believe this en banc court has gone the wrong direction: we should reject this misguided practice.

TASHIMA, Circuit Judge, with whom Reinhardt, Circuit Judge, joins, dissenting:

Because the majority, while paying lip service to *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), strips of all meaning its requirement that the waiver of the Sixth Amendment right to counsel must be "knowingly and intelligently" made, *id.* at 835, 95 S.Ct. 2525, I respectfully dissent.

The *Faretta* colloquy, far from demonstrating that petitioner's waiver was knowing and intelligent, shows that the trial court's admonitions had nothing to do with the proceedings petitioner faced, but amounted to no more than truisms and homilies—judicial sermonizing, if you will—without any regard for the particular predicament petitioner faced.[1] What the trial court told petitioner at the *Faretta* hearing[2] was that, by representing himself,

1. I agree with Judge Wallace that the stage of the proceeding at which the *Faretta* inquiry is made is relevant to our analysis. And the stage at which the defendant asserts his *Faretta* right is relevant to the content of the *Faretta* warning. *See Patterson v. Illinois,* 487 U.S. 285, 298, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988). The "dangers and disadvantages of self-representation" are, to a certain extent, content specific. I disagree, however, with Judge Wallace's conclusion that, as a result, *Faretta* warnings for sentencing proceedings do not have to be as extensive as those given at trial. While Judge Wallace's observations may be correct insofar as the run-of-the-mill sentencing proceedings are concerned, not all sentencing proceedings can be treated as generically the same. Surely, even the majority would agree that more of a warning must be given to a capital defendant who seeks to represent himself at sentencing than to a defendant in an ordinary case. So, too, in this case, which involved an evidentiary hearing, the only purpose of which was to enhance petitioner's sentence by 50 percent, a far more specific warning was required.

2. The majority also relies on the plea hearing to bolster its contention that petitioner's waiver of counsel was knowing and intelligent. While that colloquy may have been sufficient to sustain a guilty plea, in that, *inter alia,* he was informed of the possible maximum sentence that he faced, which included a dangerous offender enhancement, nowhere in the plea colloquy did the court inform him of what a dangerous offender proceeding entailed. Nor did the court ever make any connection between the information regarding the plea and the dangers of self-representation, not even by a reference back to the earlier colloquy. Plea colloquys serve an entirely different purpose than *Faretta* warnings and tell a defendant nothing regarding the nature of any post-plea proceedings.

"he ha[d] a fool for a client;" that "it just doesn't work too well;" and that he "had to have legal advice and you got serious charges here." And later on, the court advised petitioner that he was "going to put a noose around your neck." The majority emphasizes that the trial court repeatedly asked petitioner (more than six times) whether he wanted to represent himself. But repetition does not, any more than judicial sermonizing, fulfill the court's obligation under *Faretta* to inform the petitioner what "the dangers and disadvantages of self-representation" are. *Id.*[3]

Under Oregon's dangerous offender statute, a defendant convicted of a Class A felony can have his sentence enhanced to 30 years if "the court finds that the defendant is suffering from a severe personality disorder indicating a propensity toward crimes that seriously endanger the life or safety of another." Or.Rev.Stat. § 161.725(1). Petitioner was not informed of the nature of the proceeding that would take place under the dangerous offender statute, other than that he would be examined by a psychiatrist who would make a recommendation to the court of whether

petitioner had "a sustained potential for dangerous offender treatment," whatever that means.[4] He was not informed of the right to and need for the advice of counsel in connection with the psychiatric examination, whether counsel could be present when he was examined, and, most importantly, that he had the right to cross examine the psychiatrist at the dangerous offender hearing.[5] *See* Or.Rev.Stat. § 161.735(5) ("At the presentence hearing the district attorney and the defendant may question any psychiatrist or psychologist who examined the defendant pursuant to this section.") At the dangerous offender hearing, as the majority acknowledges, petitioner "did not cross-examine the psychiatrist, who performed the dangerous offender evaluation, and indicated that he was confused...." Majority op. at 1115. In fact, he again asked for counsel at this point. *Id.*

When a defendant faced with this type of proceeding waives counsel, the *Faretta* requirement that he be informed of "the dangers and disadvantages of self-representation," so that "he knows what he is doing and his choice is made with eyes wide open," 422 U.S. at 835, 95 S.Ct. 2525,

---

**3.** Fearing that truisms and repetition alone might not suffice, the majority also attempts to defend the clearly inadequate warning by arguing that, "[i]n assessing waiver of counsel, the trial judge is required to focus on the defendant's understanding of the importance of counsel, not the defendant's understanding of the substantive law or the procedural details." Majority op. at 1119. In so doing, the majority confuses two separate issues: first, what the trial court must *ask* the defendant who seeks to assert his *Faretta* rights; and second, what the court must tell *tell* that defendant. The majority is correct that the trial court is *not* required to inquire into the defendant's ability to put on a competent defense in determining whether the assertion of his *Faretta* right is knowing and voluntary. *See Faretta,* 422 U.S. at 835, 95 S.Ct. 2525 ("a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation"); *id.* at 836, 95 S.Ct. 2525 ("[The defendant's] technical legal knowledge, as such was not relevant to an assessment of his knowing exercise of the right to defend himself."). This, however, has nothing to do with

the question of what the trial court must *tell* the defendant, and, as we explain below, the obligation set out in *Faretta* is unequivocal. *See id.*

**4.** The meaning of this less-than-crystal-clear phrase, which is *not* an accurate or understandable summary of the purpose of a dangerous offender proceeding, was not further explained to petitioner.

**5.** In fact, at his *Faretta* hearing, besides the fact that the importance of and the procedures involved in the dangerous offender proceeding were unmentioned, petitioner may have been affirmatively misled by the court as to what his remaining options were: "You have only a couple of remedies as to make a strong pitch when you argue when you come up for sentencing before Judge Haas. Or to make a real pitch to say that I want to withdraw my plea and go to trial." He was not informed of his most important "remedy," or option—vigorous and effective cross-examination of the psychiatrist at the dangerous offender hearing.

can *only* be met by informing him of the nature of the proceeding. In this case, the court should, at a minimum, have told the defendant that the purpose of the proceeding was to determine whether he suffers from "a severe personality disorder" of the kind described in § 161.725, that he would be examined by one or more psychiatrists appointed by the court for that purpose, that an evidentiary hearing would then be held at which the psychiatrist(s) would be examined by the district attorney to establish that he has such a personality disorder, and that he had the right to cross-examine those psychiatrist(s). Further, the defendant should be informed that cross-examining a psychiatrist on his or her expert opinion is a highly complex and technical exercise which requires the cross-examiner to be well-versed in both law and psychiatry, and of the consequent "dangers and disadvantages" of a lay person attempting to do so. Petitioner was told none of these things, other than that he would be subject to a psychiatric examination. His waiver, in this context, could not have been knowing and intelligent. Although he may have been told *that* it was dangerous and disadvantageous to proceed without counsel, he was *not told what* those dangers and disadvantages were, as *Faretta* requires.[6]

Finally, the majority also relies on a boilerplate "Waiver of Right to Attorney" signed by petitioner. A cursory review of the form discloses that it was not intended to inform one in petitioner's position of what he faced or what he was waiving. It is obviously intended for a waiver made at the beginning of a case, for a defendant who then intends to go to trial. Further, nothing in the record indicates that petitioner read it before he signed it or, even if he did, that he understood it. And nothing in the record discloses that petitioner's attorney, the court, or anyone else explained to petitioner what the words on the boilerplate form signified. The failure to inquire in open court about the circumstances under which petitioner's signature on the waiver form was obtained fatally undercuts the majority's reliance on it. *See Lopez v. Thompson,* 175 F.3d 1120, 1129 n. 2 (9th Cir.1999) (Kozinski, J., dissenting) (citing *United States v. Balough,* 820 F.2d 1485, 1488 (9th Cir.1987)).

In the end, the majority's reliance on an inappropriate boilerplate form, the plea colloquy, and the trial court's hoary admonitions about self-representation, none of which addressed or informed petitioner what the "dangers and disadvantages" he faced by representing himself at the dangerous offender proceeding were, cannot withstand scrutiny. The majority's approach also casts aside the "pragmatic approach" the Supreme Court says should be taken in assessing a waiver of the Sixth Amendment right to counsel:

Instead, we have taken a more pragmatic approach to the waiver question-ask-

---

**6.** The majority wrongly equates *informing* the defendant what the dangers and disadvantages are with "tutelage and legal advice," and mistakenly assumes that the trial court's obligation to make the defendant "aware of the[ ] basic facts," *Patterson,* 487 U.S. at 298, 108 S.Ct. 2389, is tantamount to a "requirement to assess 'how well or poorly [a defendant] mastered the intricacies' of ... state law." Majority op. at 1119. Although "the trial judge is under no duty to provide personal instruction on courtroom procedure or to perform any legal 'chores' for the defendant that counsel would normally carry out," once a defendant has asserted his right to self-representation, *Martinez v. Court of Appeal,* —— U.S. ——, 120 S.Ct. 684, 691 —— L.Ed.2d ——, (2000) (citation omitted), the trial judge is under an unambiguous duty to make the defendant aware of "the usefulness of counsel to the accused *at the particular proceeding,* and the dangers ... of proceeding without counsel." *Patterson,* 487 U.S. at 298, 108 S.Ct. 2389 (emphasis added). How a judge can make a defendant aware of the usefulness of counsel at a particular proceeding without some explanation of the nature of the proceeding is merely one of the many puzzles posed by the majority opinion. The true vice in the majority opinion is that it employs ritualistic formulas in a wholly mechanistic manner and fails utterly to examine how those rules apply in the practical circumstances of this or any other specific, real-life litigation.

ing what purposes a lawyer can serve *at the particular stage of the proceedings in question*, and what assistance he could provide to an accused at that stage-to determine the scope of the Sixth Amendment right to counsel, and the type of warnings and procedures that should be required before a waiver of that right will be recognized.

*Patterson v. Illinois*, 487 U.S. 285, 298, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988) (emphasis added). Further, the Court counseled that we should "define[ ] the scope of the right to counsel by a pragmatic assessment of the usefulness of counsel to the accused *at the particular proceeding*, and the dangers to the accused of proceeding without counsel. An accused's waiver of his right to counsel is 'knowing' when he is made aware of these basic facts." *Id.* (emphasis added). Here, petitioner was not "made aware of these basic facts." As a result, his waiver was not knowingly made.[7]

Finally, without closely examining our *Faretta* jurisprudence, the majority mistakenly concludes that "[b]ecause we cannot impose a procedural framework on state courts unless compelled by the Constitution, we need not address whether the suggested colloquy was followed here." Majority op. at 1117. Our cases have not, any more than *Faretta* itself, simply imposed (or "suggested") a procedural framework on the state courts. *Faretta*, like many of its progeny, reviewed a state court proceeding, and the procedures we have developed over the last 25 years for federal and state cases simply implement *Faretta*'s constitutional mandate.

Clearly, our cases require more than the majority is willing to acknowledge. *See, e.g., United States v. Farhad*, 190 F.3d 1097, 1101 (9th Cir.1999) (per curiam) ("Following the Supreme Court's direction,

this court has published dozens of opinions applying *Faretta* to proceedings in both federal *and state courts*." (citations omitted) (emphasis added)). We have, for example, applied the requirements of *United States v. Balough*, 820 F.2d 1485, 1488 (9th Cir.1987), which the majority mistakenly insists are only "suggestions," majority op. at 1125, in state habeas cases as a matter of constitutional law:

> The preferable procedure for determining whether the waiver is made knowingly and intelligently is to discuss with the defendant in open court his understanding of the charges, the possible penalties, and the dangers of self-representation. *United States v. Dujanovic*, 486 F.2d 182, 188 (9th Cir.1973). The failure to engage the defendant in such a colloquy does not necessitate reversal, however, if the record otherwise reveals a knowing and intelligent waiver. *Cooley v. United States*, 501 F.2d 1249, 1252 (9th Cir.1974). *This exception, however, should be rarely invoked. United States v. Aponte*, 591 F.2d 1247, 1250 (9th cir.1978).

*Harding v. Lewis*, 834 F.2d 853 (9th Cir. 1987) (emphasis added). Thus, under *Harding*, the trial court was required to follow the preferred procedure or otherwise to insure that petitioner's waiver was knowing and intelligent. It did not do so. Moreover, we have continued to apply the *Balough/Harding* requirement in state habeas cases.

> The rule set forth in both *Hendricks* [*v. Zenon*, 993 F.2d 664 (9th Cir.1993) ] and *Balough* is that "in order to invoke the Sixth Amendment right to self representation, the request must be: (1) knowing and intelligent, and (2) unequivocal." *Hendricks*, 993 F.2d at 669. "For a

---

**7.** The majority states that "the only remaining proceeding was the sentencing hearing," and asserts that its "analysis is not a general one but is focused on counsel's role 'at [this] particular stage of the proceedings.'" Majority op. at 1119 (quoting *Patterson*, 487 U.S. at 298, 108 S.Ct. 2389). But there are sentencing hearings and sentencing hearings. What

the majority fails to recognize is that this was no ordinary, run-of-the-mill sentencing hearing, but an evidentiary hearing at which expert testimony would be adduced for the purpose of determining whether the sentence should be enhanced by 50 percent based on a specific, statutorily-required finding.

waiver to be made 'knowingly and intelligently,' the petitioner must be aware of the nature of the charges against him, the possible penalties, and the dangers and disadvantages of self-representation." *Id.* at 670.

*Snook v. Wood,* 89 F.3d 605, 613 (9th Cir.1996). The dissent to the panel opinion summarized our *Faretta* jurisprudence well:

> Although we've stopped short of articulating a precise litany on the dangers and disadvantages of self-representation, *see United States v. Keen,* 104 F.3d 1111, 1114 (9th Cir.1996), we've made it clear that a judge must ensure "that the defendant understood his or her 'constitutional right to have [a] lawyer perform certain core functions and the lawyer's superior ability to handle them.'" *United States v. Mohawk,* 20 F.3d 1480, 1484 (9th Cir.1994) (quoting *United States v. Kimmel,* 672 F.2d 720, 721 (9th Cir. 1982)). We've held that telling a defendant he will have to handle sentencing himself isn't enough. *See United States v. Balough,* 820 F.2d 1485, 1486 n. 1, 1488 (9th Cir.1987). Nor is informing a defendant that he'll have to argue and cross-examine witnesses. *See Keen,* 104 F.3d at 1115. The judge here didn't even get this specific. He told Lopez: "[E]ven when a lawyer represents himself, he has a fool for a client"; "[Y]ou're going to put a noose around your neck"; and "you have ... to make a strong pitch when you argue." If the colloquies in *Balough* and *Keen* were not sufficient to uphold the defendants' waivers, the exchange here, rich with aphorisms and hyperbole but with no specific mention of a lawyer's "core functions," is certainly not.

*Lopez v. Thompson,* 175 F.3d at 1128–29 (Kozinski, J., dissenting).

As an intermediate appellate court, we have the obligation faithfully to apply *Faretta* and to give it meaning, regardless of our views as to its wisdom. *See Farhad,* 190 F.3d at 1100–01; *id.* at 1101–02 (Reinhardt, J., concurring specially). Unfortunately, the majority not only fails in that

task, but, by barely acknowledging the existence of the "dozens of [our] opinions applying *Faretta* to proceedings in both federal and state courts," *id.* at 1101, and by its facile discussion of them, it has added confusion and ambiguity to our *Faretta* jurisprudence.